JUDGE COFER
delivered the opinion oe the court.
January 27, 1872, the appellee, Shotwell, proposed, in *275 writing, to J. Lawrence Smith, Arthur Peter, H. F. "White, P. G. Kelsey, Theodore Harris, and the appellant Burton, that he would sell to them certain coal-mines and their appurtenances at the price of $216,000, to be paid for as follows, viz.: $100,000 in the ten-year ten-per-cent bonds of a corporation which they contemplated organizing, secured by the personal guarantee of the purchasers; one third of the stock of that corporation; and $16,000 to be paid to discharge an encumbrance on the property. On the same day it was agreed by the parties that the property should be stocked at $300,000. The written proposal was accepted in writing on that day— which was Saturday — by all to whom it was made, except Smith, who promised to sign it on the following Monday. He, however, signed the agreement to stock the property at $300,000 on Saturday.
The proposal to sell, and the acceptance indorsed thereon and signed by all except Smith, was left on Saturday evening with Harris to be signed by Smith on Monday. Both Burton and Shotwell were then present, and were informed that Smith had not signed the acceptance, but would do so.
During Saturday afternoon, and probably after all that has been stated had occurred, Burton and Shotwell entered into a contract by which Burton sold and agreed to convey to Shot-well certain real estate in the states of Illinois and Kentucky, for which, as the purchase price, Shotwell agreed to assume the payment of certain liens on the property purchased, amounting to about $33,500, and to transfer to Burton $55,500 of the stock to be paid to him by “the company this day agreed to be organized, and which has bought out his (ShotwelPs) coalmines.”
Between the time of entering into the latter contract, which •was late on Saturday evening, and the following Monday morning, Shotwell became dissatisfied with it, and determined to get rid of it by withdrawing his proposal to sell the mines, *276 and thereby to defeat the organization of the projected corporation. Accordingly on Monday morning, as' early as nine o’clock, he caused to be delivered to Harris a note withdrawing his offer to sell the mines. Burton was present when the note was delivered to Harris, and was made acquainted with its contents.
Afterward, on the same day, Burton, without disclosing to Smith that Shotwell had withdrawn the offer, presented it to him and obtained his signature to the acceptance.
Still later in the day Shotwell was notified by Harris that his offer had been accepted by all the persons to whom it was made.
On the same day on which Smith signed the acceptance he called on Harris, who had the custody of the paper, and in the presence of a part, but not of all, of his associates drew a pen across his name, for the purpose of canceling his acceptance.
The proposed corporation was never organized nor any further steps taken toward its organization.
Soon after the 29th of January, Burton notified Shotwell that he would in a short time tender conveyances in compliance with their contract, and desired him to be in condition to comply on his part. Deeds were accordingly tendered, and Shotwell declining to accept them, this suit in equity was brought to obtain specific performance.
The prayer of the petition is for a specific execution of the contract between Burton and Shotwell; that Shotwell be compelled to accept title to the real estate therein sold to him, “and to pay therefor said sum of $55,500 in cash or in the stock of said company, as provided in said contract, and for all proper relief.”
Shotwell answered, setting forth the offer to sell the mines, and alleged that it had not been fully accepted by those to whom it was made. He also alleged that, after the proposal was made to sell the mines, Burton proposed to sell him the real estate *277 mentioned in the contract between them, and represented that it was worth $89,000, when in fact it was not worth more than one half that sum; that he also represented that he had good title to all of said property, when in fact he had no title to any part of it; that upon these representations and assurances, and upon the further representation and assurance that the contract between them would have no legal effect until carried out and executed by both, in accordance with the proposition for the sale and purchase of the mines, he was induced to sign the contract with him, “but upon the express condition and understanding that the said contract should not have any effect until he had examined the said property and become satisfied therewith,” and that he “never signed said contract except upon said conditions, nor intended it to be binding or have any effect unless the proposed sale of said coal-mines should be effected and completed, and this defendant should be satisfied with plaintifFs property after examination.” He further alleged that the proposed agreements were dependent, and the one proposed to be made with Burton for the purchase of his property was the sequence of and dependent upon the consummation of the contract for the sale and purchase of the mines; that he never agreed nor was expected to pay Burton any money for his property. He denied that the deeds tendered were sufficient to convey good title to the property in Illinois, or that Burton was able to convey a good title to the property in Kentucky.
In an amended answer he alleged that Burton had misrepresented the location of a portion of the property in Illinois, and that situated as it actually was it was worth much less than it would have been if it had been situated where it was represented to be.
He also alleged that Burton was an active originator, promoter, and organizer of the scheme to purchase his coal-mines; that neither he nor any of his associates had offered to comply *278 with, that contract, but had acquiesced in his withdrawal of his offer to sell.
We have already stated the facts relating to the acceptance of the offer to sell the mines, and need not repeat or comment on them further than to say that the proposal was accepted, notwithstanding its withdrawal; and that the erasure of Smith’s name could not, as between himself and Shotwell, have affected the validity of his acceptance, nor canceled his liability in that contract.
The sufficiency of Burton’s title to the Illinois property is not now questioned.
The allegation that Burton represented and assured Shot-well that the contract between them would have no legal effect until carried out and executed by both, in accordance with the proposition for the sale and purchase of the mines, is not sustained by the evidence, nor does the evidence show that it was agreed or understood between the parties that the contract should not take effect until Shotwell should examine Burton’s property, and be satisfied with it. On the contrary, it is proved, by a decided preponderance of the evidence, that Burton offered to leave the matter open until Shotwell could examine the property; but the latter declined the offer, and the contract was signed.
That Shotwell may have intended the contract with Burton should not be binding unless the proposed sale of the mines was effected, could in no event be a defense, unless Burton was apprised that he so intended and agreed that he should not be bound, which is not claimed.
The objection urged to the deeds tendered is based on the alleged fact that they were not stamped as required by the act of Congress then in force. There are two obvious answers to this objection: (1) the stamp act was repealed long prior to the hearing of the cause, and the deeds, not having been delivered, were valid without stamps; (2) no objection was made *279 for want of sufficient stamps, and any that might have been made on that ground was waived.
The next question we will consider is, whether the agreement between Burton and Shotwell was dependent upon the completion of the proposed sale and purchase of the mines and the organization of the proposed corporation, a part of the stock of which was to be transferred by Shotwell to Burton in payment for the latter’s real estate; and, if so, whether the non-completion of that scheme defeated the contract between them.
That contract was an agreement for the exchange of prop- ■ •erty. It was not a sale. Shotwell did not agree to pay money for the real estate.
At the time the contract was made the property agreed to be transferred had only a potential existence, and Burton knew that fact. Both knew that Smith had not signed the acceptance, and that the scheme for the purchase of the mines might fail by his refusal. If he had refused to accept the offer, or if, from any other cause for which neither Burton nor ■Shotwell was responsible, the scheme had failed, neither could have enforced the contract between them against the other. Burton could not have been compelled to accept the value ■of the stock, and convey the real estate, nor could Shotwell have been compelled to pay its value and accept title to the property.
Shotwell could not have enforced the contract, because he would have been unable to tender performance on his own part. Burton could not have enforced it, because Shotwell, without fault and from causes in view of which the parties contracted, would have been unable to comply, and for the same reason would not have been liable for damages for a breach of the contract. We are therefore of the opinion that the contract between Burton and Shotwell was, in a qualified sense, dependent on the completion of the sale of the mines *280 and the organization of the proposed company. But it was dependent only so far, that if the sale of the mines had failed without the fault of either, neither could have enforced it against the other. It was not, however, so far dependent that either might, by his voluntary act, defeat the proposed sale, and thereby relieve himself of the obligations imposed by the dependent contract.
The parties having contracted with reference to the proposed sale of the mines and organization of the corporation, and their contract being dependent upon the completion of that scheme, it was .implied in that contract that each of the contracting parties would in good faith carry out the scheme, so as to put himself in position to perform his dependent contract.
It is true Shotwell had a right, as between himself and! the proposed purchasers of the mines, to withdraw his offer to sell at any time before it was accepted in writing by all those-to whom it was made. But as between himself and Burton he had no such right. To do so was a violation of the contract between them.
But his counsel argue that, although it may be true he thus violated his contract with Burton, still he is not to be taken to have been the author of his own inability to perform his agreement.
To support, this proposition they introduced evidence conducing to prove that Peter and Smith, two of the proposed purchasers, had ah understanding or agreement with Kelsey, one of the associates in the enterprise, at or before the time when they signed the acceptance of Shotwell’s offer, that they were not to be compelled to guarantee the bonds to be issued by the proposed corporation to Shotwell, and that they would have refused to do so.
Upon these facts counsel argue that Peter and Smith would have refused, and could not have been compelled, to perform *281 their agreement, and that therefore it never was in Shotwell’s power to perform his part of the contract with Burton, and never would have been if he had not withdrawn his offer.
He admits that he became dissatisfied with his contract, with Burton and withdrew his offer to sell the mines in order to defeat it, and it may well be doubted whether a court of, equity ought at his instance to enter into an inquiry whether the contract for the sale of the mines could have been enforced against Peter and Smith. It is, however, entirely clear that no contemporaneous verbal understanding or agreement between them and their associate, Kelsey, could have defeated Shotwell in an effort to enforce the contract against them.
' But it is doubtful whether, from the nature of the contract, it could have been enforced specifically in all its provisions. ■ There can, however, be no doubt but Smith would have accepted the offer, and thus completed the contract fbr the sale of the mines, if the offer had not been withdrawn. His acceptance, notwithstanding the withdrawal, is conclusive of that fact. If, then, it had not been withdrawn, Shotwell could have tendered performance on his part, and if the purchasers had refused to perform their part of the contract they might have been compelled to accept the title and pay the value of the stock and bonds they had contracted to issue to Shotwell, and to discharge the lien of $16,000, as they had contracted to do.
This would not have enabled Shotwell to oomply with his contract with Burton; but we certainly will not, in order to relieve Shotwell from a contract he has deliberately violated, presume that the purchasers of the mines would have subjected themselves to the consequences of a refusal to comply with their contract, rather than voluntarily to perform it by the organization of the proposed corporation, and the issue of the bonds and stock contracted to be delivered to Shotwell. He is not in an attitude in this record to escape from the obliga *282 tions of his contract upon conjecture and speculation. He has not done more than manifest a bare probability that if he had done what he might and should have done, he would still have been unable to perform his agreement; and we can not do otherwise than hold that his inability is the result of his own conduct.
His counsel next insist that he can not be compelled to perform the contract, because of a want of mutuality.
The general doctrine seems to be that an executory contract can not be specifically enforced by one party unless at the time of its execution it is capable of being so enforced by either party. (Fry on Specific Performance, sec. 286.) And this rule applies as well to the remedy as to the obligation of the contract. (Cooper v. Pena, 21 Cal. 404.)
That there was the requisite mutuality in the obligation of the contract in question is clear. Was there mutuality in the remedy ?
It is contended there was not — first, because, as claimed by counsel, a court of equity will not specifically enforce a contract for the transfer of stock in a corporation; and, secondly, that Shotwell never having had the stock contracted to be transferred, it was impossible to enforce compliance with his contract to transfer it.
Whatever may be the rule in regard to the specific enforcement of a" contract respecting the shares of a private corporation, when such shares constitute the sole and entire subject-matter of the contract, we think there can be no doubt that a contract to exchange such shares for real estate may be enforced at the instance of either party.
The chancellor can not decree the specific performance of a contract to pay money for a mere chattel, by compelling the purchaser to accept the title and pay for it; but he will enforce a contract to pay money for land by compelling the purchaser to receive the title and pay the price. It is the land that gives *283 jurisdiction to the court to enforce the contract. So in this case the chancellor, having jurisdiction to enforce the contract in respect to the real estate, would have had jurisdiction, at the suit of Shotwell, to compel Burton to accept the stock and convey the real estate; and at the suit of Burton, to compel Shotwell to accept the title and transfer the stock.
That Shotwell did not have the stock did not render the contract unenforceable. We have seen that his failure to get it is to be taken to be the result of his own conduct in withdrawing his offer to sell the mines, in violation of his duty under his contract with Burton. He is therefore in the same position he would have occupied if the scheme for organizing the corporation had been carried into execution, and the stock had been issued to him, and disposed of so as to put it out of his power to transfer it to Burton. In that case there can be no doubt but he would have been compelled to accept the conveyances of the real estate and pay the value of the stock in cash.
The contract describes the real estate in Kentucky as “a brick house and lot ” situated in Louisville, “ on Main Street between Floyd and Preston, the same bought by Burton of • Mrs. Gray, about March, 1871; also two cottages on Floyd Street and two cottages on Washington Street, built by Burton on the land above referred to as bought of Mrs. Gray.”
In the deed tendered by Burton there is reserved to Mrs. Louisa S. Gray, Burton’s vendor, and her heirs forever, the free and uninterrupted use and enjoyment of an alley-way four feet wide and extending back from Main Street forty-three and one half feet, on the west side of the lot. The same reservation is contained in the deed from Mrs. Gray to Burton.
Burton’s contract bound him to convey to Shotwell all he had purchased of Mrs. Gray, and, in our opinion, his déed is a compliance with his contract.
The evidence shows that Shotwell examined the property *284 before he entered into the contract, and that the alley-way was then open and in use under the reservation, and he must be presumed to have bought with a knowledge of its existence.
This brings us to the consideration of the criterion of recovery.
Shotwell having, by his own act, put it out of his power to oomply with his contract to transfer the stock, is liable for its value.
The contract shows that the parties estimated the mines, which were to be the basis of the stock, at $216,000; to be paid $16,000 in cash, $100,000 in bonds bearing ten per cent, and so secured as to be equal to cash, and $100,000 in the shares of the corporation. The mines were to be stocked at $300,000. Practically Shotwell was to sell two thirds of the mines for the equivalent of $116,000 in cash. Estimated on this basis the cash value of the mines was $174,000, and the cash value of $55,500 of stock was $32,190; and for that sum, with interest from the commencement of this suit, Burton is entitled to judgment.
In response to the suggestion of Shotwell’s counsel, that the deeds not having been recorded within the time prescribed by law after their acknowledgment by Mrs. Burton will not bar her potential right of dower, we remark that no judgment should be rendered in conformity to this opinion until the deeds are re-acknowledged by her.
Judgment reversed, and cause remanded for further proceedings in conformity to this opinion.