## Lucas v. Commonwealth.

(Decided April 25, 1913).

### Appeal from Warren Circuit Court.

1.  Homicide—Evidence—Competency.—Where a person charged with murder had repeatedly told the deceased to discontinue visiting the prisoner's home, it was competent to show by the neighbors that the deceased visited the prisoner's home.

2.  Homicide—Evidence—Dying Declaration.—Dying declarations are admissible to prove the fact of the killing, who was the murderer, and such other facts and circumstances as are immediately attendant on the homicide and form a part of the res gestae. They may extend to the entire circumstances of the fatal occurrence, but should not include narratives of matters not immediately connected with it.

D. W. WRIGHT and B. F. WALLACE for appellant.

JAMES GARNETT, Attorney General, and D. O. MYATT, Assistant Attorney General for appellee.

Opinion of the Court by Judge Miller—Reversing.

The appellant, Lucas, was indicted for the murder of John W. Harlin. Upon his trial he was found guilty of voluntary manslaughter, and given an indeterminate sentence of from two to twenty-one years in the penitentiary. He appeals.

Lucas was a sawyer, working at the White Stone quarry near Bowling Green; while Harlin was the superintendent of the quarry. The office occupied by the superintendent was situated between the quarry and the cottage in which Lucas lived, and about 150 yards from the cottage. The shooting occurred on June 17, 1912, while Harlin was in Lucas' residence—Lucas shooting from the outside.

Some time previous to the day of the tragedy, persistent rumors had come to the ears of Lucas, that Harlin had been paying frequent visits to Lucas' wife; whereupon Lucas, according to his testimony, remonstrated with Harlin some seven or eight times, and asked him to stay away. Lucas says that although Harlin accused him of being drunk and unduly suspicious on the occasion of one of the earlier remonstrances, Harlin finally promised not to go about the house any more. In the meantime, Lucas had seen Harlin come out of the gate.

The shooting occurred on a Monday; and Lucas says that on the preceding Thursday, Harlin told him that Mrs. Lucas was going to town with Harlin in his car; whereupon Lucas answered, "I have asked you to stay away from there. I have two little children and want to raise them right, and I can't bear the idea of going off and leaving them." Lucas then again told Harlin to stay away from his house; whereupon Harlin accused Lucas of being drunk, or with having lost his mind. Lucas provided his wife with a buggy, but she returned in the car, with Harlin. On Monday morning, and before the shooting occurred, Harlin had a conversation with one of the workmen in regard to a strike of the union men that was then in force at the quarry, and in his dying statement, Harlin says that on this occasion he had a quarrel with Lucas about the union and the strike. Lucas denies this, although he admits having seen Harlin between eight and nine o'clock on that morning.

Lucas' version of the shooting is as follows: At the noon hour, while he was at the mill, Harlin came out of the office and walked down to Lucas' house. Lucas fol-

lowed him, and went to the kitchen door, which he found buttoned. He opened the door with his knife and entered the house, which contained three rooms. When Lucas went to the folding door leading to the bed room, he found Harlin and Mrs. Lucas on the bed. Upon seeing Lucas, Harlin jumped up, and upon seeing Lucas reach for his shot gun, which stood behind the door, Harlin jumped against the door; whereupon Lucas ran out the rear door and around the house, and as he passed an open window, he fired a shot through it at Harlin, which took effect in Harlin's right leg above the knee. As Harlin unhooked the front door, Lucas again fired, shooting Harlin in the hand. Harlin was taken to his home, where he continued to grow worse until Sunday, when he was carried to a hospital. He died about Sunday midnight, from blood poisoning.

About thirty-six hours before his death, Harlin made a dying declaration to the attending physicians, which had been written out by them and signed by Harlin. When this declaration was shown to an attorney, he advised them that it was not sufficient in form, because it did not recite the fact that Harlin believed himself to be *in extremis* at the time he made it. In order to supply that omission, on Sunday morning, about fifteen hours before Harlin's death, the doctors wrote a new declaration for Harlin, which was substantially the same as the old one, except that the opening sentence was new. That declaration was signed by Harlin; witnessed by the doctors; and reads as follows:

"Realizing my condition and recognizing that my demise is impending, I desire to make the following statement regarding my injury with reference as to how my injury occurred. I was shot by Ed. Lucas, and it was a concocted scheme to get rid of me. On Saturday I was given a prescription by Mrs. Lucas to have filled in town and bring the medicine to her. On Monday I took off my coat when I went to work, and at dinner it was raining so I put on my coat and found the prescription in the pocket of the coat, and realized that I had forgotten it. I went to the house to leave the prescription that they might send it in town by some one else. I was standing in the door just in the house and was there not longer than three minutes. I did not go into the house at any time, but just inside the doorway. Lucas came out of the kitchen and sneaked around the house and without a word of warning shot me in the leg as I was standing at the door.

I started toward him taking two or three steps when the second shot struck me in the hand. Lucas was standing on the ground and I was on the porch. I was never warned not to come to his house; but about four weeks before this time we were standing in Lucas' yard talking when he told me that he had heard some bad reports about my coming to his house. I told him if that was the case I would not come around any more; but he said later that he knew there was nothing in it and that that was all right. On the morning of the same day on which I was shot, two or three hours before, Ed Lucas and I had a quarrel on the mill yard about the union and the strike. I upbraided him pretty strongly about the matter and he did not resent any of it.

"I was never guilty of any immoral or improper conduct with the wife of Ed Lucas either at the time of the shooting or immediately before it or at any other time or occasion. We were never ,either at or preceding the shooting, or at any other time, guilty of any illicit relation with each other.

"Signed this June 24, 1912.

"Witnesses,                             His
     "Jno. H. Blackburn,      "J. W. x Harlin.
     "Fred D. Reardon,               Mark.
     "R. L. Stoddard."

There is no complaint as to the instructions. We are asked, however, to reverse the judgment upon two grounds: (1) because the court erred in admitting certain parts of the dying declaration of Harlin; and (2) because the court refused to permit the defendant to show by Mrs. Still and John Still, who were near neighbors, that Harlin visited the Lucas home five or six times a day.

Disposing of the last ground first, it is sufficient to say that the record shows that the testimony of these witnesses, as to the visits of Harlin, was admitted without objection; there is nothing in the record to show that any of it was rejected. It was competent, and was properly admitted.

The objection to the ruling of the court in admitting certain portions of the dying declaration of Harlin presents a more serious question. The corrected bill of exceptions shows that the court orally instructed the jury, during the progress of the trial, and when the dying declaration of Harlin was read, that that part of it in

which Harlin said that the shooting by Lucas was a concocted scheme to get rid of him, was not competent, and should not be considered by the jury for any purpose; while by instruction No. 7, the court further instructed the jury that the statement contained in the dying declaration of Harlin, which asserts that he, Harlin, had never on other occasions prior to the time of the shooting, been guilty of any immoral or improper relations with the wife of Lucas, was not competent, and the jury should not consider that part of the evidence.

These two rulings were clearly proper; but it is contended they did not go far enough, because there are other portions of the dying declaration which are equally objectionable.

Dying declarations are statements of material facts concerning the cause and circumstances of the homicide, made by the victim under the fixed and solemn belief that his death is inevitable and near at hand, and as such are to be distinguished from other admissible declarations, such as declarations which constitute a part of the *res gestae* or declarations made in the presence of the accused. Such declarations voluntarily made by the deceased, while sane, when *in articulo mortis,* and under the solemn conviction of approaching dissolution, concerning facts and circumstances constituting the *res gestae* of his destruction, are always admissible in evidence, provided the deceased would be a competent witness, if living.

In 21 Cyc, 975, it is further said:

"From the very necessity of the case, dying declarations are admissible to prove the fact of the killing, who was the murderer, and such other facts and circumstances as are immediately attendant on the homicide, and form a part of the *res gestae.* They may extend to the entire circumstances of the fatal occurrence, but should not include narratives of matters not immediately connected with it."

This rule has been repeatedly followed in Kentucky. Leiber v. Commonwealth, 9 Bush, 11; Collins v. Commonwealth, 12 Bush, 271; Terrell v. Commonwealth, 13 Bush, 276; Starr v. Commonwealth, 97 Ky., 193; Johnson v. Commonwealth, 32 Ky. L. R., 1117, 107 S. W., 768.

In recognizing to its fullest extent, the limitation of the rule which restricts the scope of the dying statement to the *res gestae,* this court used the following language in Leiber v. Commonwealth, *supra*:

"The admission of dying declarations as evidence being in derogation of the general rule which subjects the testimony of witnesses as ordinarily received to the two important 'tests of truth,' an oath and a cross-examination, it is obvious that such evidence should be admited only upon the grounds of necessity and public policy, and should be restricted to the act of killing and the circumstances immediately attending it and forming a part of the *res gestae.*"

The portions of the dying declaration that we condemned as inadmissible in Leiber v. Commonwealth, purported to disclose former and distinct transactions not relating to the particular facts constituting the subject matter of the charge, or the identification of the defendant, but were such that the jury might have inferred therefrom the existence of malice on the part of the accused toward the deceased.

Applying this well established rule to the dying declaration before us, it is clear that it was competent in so far as it related to the immediate facts connected with the shooting, including Harlin's statement giving the reason why he went to the Lucas house; but so much thereof as related to the prior conversation with Lucas; his failure to warn Harlin not to go to the Lucas house, and the quarrel at the mill about the union and the strike, was incompetent and should not have been submitted to the jury. So much of the statement as denied Harlin's guilt of any immoral or improper conduct with Mrs. Lucas at the time of the shooting was competent; and, as the trial court rejected all·testimony of this character that related to any previous conduct of this kind, as was above pointed out, there was no error in the ruling upon that portion of the declaration.

For the error in the respect above indicated, however, the judgment is reversed, and the case remanded for further procedings.