## Ulrich v. Commonwealth.

(Decided October 4, 1918.)

### Appeal from Campbell Circuit Court.

1. Homicide—Dying Declarations.—The statements of a deceased person may be admitted as a dying declaration even though she does not, in express words, declare she knows she is about to die, or make use of equivalent language, if it be made to appear by her acts, statements and the surrounding circumstances that she visualized the situation and realized that death was impending, and did in fact shortly thereafter die.

2. Homicide—Dying Declarations.—A statement made just before death by one who had been poisoned as to how she came to take it, is competent as a dying declaration even though she had not expressly declared her belief that she was about to die, where she called for a priest and asked to be annointed, she being a member of the Catholic church.

3. Criminal Law—Hypothetical Questions.—Psychological questions sometimes enter into the consideration of criminal cases, but there must be sufficient facts included in the hypothetical questions on which one learned in the science may with reasonable certainty base an opinion, and the answers must be something more than mere conjecture.

4. Criminal Law—Evidence—Instructions.—Where the defendant is accused of murder by administering poison to his wife, and the jury is instructed that if it believe from the evidence beyond a reasonable doubt that defendant did administer the poison to his wife, and that death resulted as a consequence, to find him guilty of murder, it was unnecessary to tell the jury that if the wife committed suicide or took the poison by accident the defendant was not guilty, an instruction being given that if from the whole evidence the jury entertain a reasonable doubt of the defendant's guilt, it was their duty to find him not guilty.

HOWARD M. BENTON for appellant.

CHARLES H. MORRIS, Attorney General, and OVERTON S. HOGAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

The appellant Ulrich was accused by indictment and convicted of administering poison to his wife which produced her death. His punishment was fixed at life imprisonment. On this appeal, while assigning several errors, he relies chiefly for reversal upon what he asserts was the admission of incompetent evidence as a dying declaration. Appellant and deceased had not lived together for more than two years before her death. Appellant married her under protest, and soon after he had been arrested and placed in jail on a bastardy charge. He lived with her only a short time and abandoned her although he lived within a few blocks of her home. Deceased seemed to love her husband and frequently visited him at his father's home, but he never went to see her. After he abandoned his wife he became enamored of another young woman in the neighborhood who bore him a child. He had sought to get a divorce from deceased, and had stated to different persons that he hoped to be rid of her. On the night before her death the wife went to see appellant at his home. Appellant says he met her on the street, and admits that he gave her a package of paris green, which he says he purchased at her behest, she providing the money with which to pay for it. After the death of the wife the coroner was called in and an autopsy and inquest were held. It was

discovered that the deceased had swallowed a large amount of paris green and that she had died from poisoning. The coroner questioned the appellant with reference to when he last saw his wife and about whether he had furnished her paris green, and he denied having seen her, and further denied that he had ever purchased or furnished her paris green. The coroner thereupon accused him of buying paris green at a nearby drug store on a certain day immediately preceding, whereupon appellant admitted that he did buy paris green and did give it to his wife, but said she requested him to buy it, furnishing the money with which to pay for it, and that she stated to him she wanted it to kill roaches which infested the wash room of her mother's house. No one saw him give her the paris green, but appellant proves by his mother and certain other persons at his home that the deceased came there on the day previous to the night on which she received the paris green, and requested appellant to buy her a dime's worth of paris green and gave him the dime with which to pay for it, and that she then stated she wanted it to use as an insecticide. On the morning before her sickness and death the deceased seemed bright and happy, and went about her work singing. Her mother, with whom she lived, went out in the city about eight o'clock in the morning and did not return until about 12:30 o'clock in the afternoon; about 11 o'clock an aunt of deceased came to the house and found her very sick, in great misery and frequently vomiting; the stuff which she emitted was greenish in color; her bowels moved frequently and she was in intense agony. About 11:30 o'clock deceased said to her aunt, "I feel that I am bound to die." Up to this time the aunt did not know that deceased was poisoned. After the mother returned, and about 4 o'clock in the afternoon, she discovered a package on the mantel near where deceased was in bed which contained a greenish powder, the nature of which she did not know. Taking the package to the deceased, who was then in bed very sick and rapidly growing weaker, she inquired of her concerning it. Upon being asked who gave the package to her, deceased answered, "Will gave it to me." Will was her husband. When asked what he gave it to her for, deceased answered, "For my bowels." Deceased was then asked, "How did you take this stuff?" and she answered,

"I got a glass down;" she was then asked, "How much did you take of this?" and she answered, "A spoonful." To the question, "Where did you put this glass?" she answered, "In the safe, in the cupboard, in the kitchen." In the cupboard in the kitchen was found a glass tumbler in which paris green had been mixed in water and from which she said she drank the poison. For some days before her death deceased had been complaining of her bowels and had been to a physician for treatment. The theory of the defendant is, that his wife took the poison with the intention to commit suicide or else by mistake. In either case he would not be guilty. He complains bitterly that the court allowed the statement made by his wife just before her death that appellant gave her paris green for her bowels, to go to the jury as a dying declaration. The statement was not competent as a dying declaration unless it was made by deceased *in extremis* and when all hope of recovery was gone. Appellant insists that she made only one statement with reference to dying, or that indicated she thought herself in danger of death, and this statement is not absolute but only suggestive, and it was made at about 11:30 o'clock in the morning, and the death did not occur until about six o'clock in the evening. It is true that so far as the record discloses she only made one direct reference to dying and that was when she said to her aunt, about 11:30 o'clock a. m., "I feel that I must die." At that time she was very sick, suffering extremely and vomiting violently. She gradually grew worse, although that afternoon the evidence shows that she became quieter. Before the package of paris green was found on the mantel by the mother, the deceased, who was a Catholic, called for the priest and wanted to be annointed. This was a preparation for death, and clearly indicated that she realized death was impending. Her condition, with the surrounding circumstances, as well as her statements with reference to her condition, and the desire for the priest, must be taken into consideration in determining the question as to whether the court properly admitted the statements of the deceased as a dying declaration. The dying declaration of a person killed is admissible in evidence against the person charged with the homicide to prove any relevant fact embraced within the *res gestae* of the killing. Before

a dying declaration is admissible it must first be shown
that it was made *in extremis,* under a solemn sense of
impending death, and when the party has given up all
hope of this life and when he is at the point of death;
when every motive to falsehood is silenced and the mind
is induced by the most powerful considerations to speak
the truth. These facts may be shown by the words or
statements of the deceased, or by the surrounding condi-
tions or by his acts. In Roberson's Kentucky Criminal
Law, section 226, it is said: "To render a statement ad-
missible as a dying declaration it must first be shown
by the party offering it in evidence that it was made *in
extremis,* under a solemn sense of impending death, and
when the party has given up all hope of this life, but
whether this be so or not may be determined not only by
what he may say but by his conduct, the character of the
wounds, the opinions of physicians or others attending
him, and all the surrounding circumstances; and he need
not, in *express words, declare that he knows he is about
to die, or make use of equivalent language.* The true test
of the admissibility in evidence of such declarations is
the belief in the mind of the party making them that he
will soon die." People v. Commonwealth, 89 Ky., 497.
In the case of Commonwealth v. Matthews, 89 Ky. 292,
in considering the admissibility of dying declarations,
the court said: "It is well settled that a statement to be
admissible as a dying declaration must be made when the
party is *in extremis* and has given up all hopes of this
life; but whether this be so or not may be determined
not only by what he may say, but by his evident danger
and all the surrounding circumstances. *The injured
party need not, in express words, declare he knows he
is about to die, or make use of equivalent language.*" It
was held in Daniels v. Commonwealth, 154 Ky. 601, that
a dying declaration was admissible which was made sev-
eral days before death ensued. This was upon the prin-
ciple that where the deceased is under the belief not
merely of the possibility of death nor even of its proba-
bility, but of its certainty, his statements may be received
as dying declarations. See Eversole v. Commonwealth
157 Ky., 478; Alsop v. Commonwealth, 164 Ky. 171;
Kavanaugh v. Commonwealth, 172 Ky., 799.

Reviewing the authorities we are firmly of the opin-
ion that it is not necessary to entitle a statement to be

admitted in evidence as a dying declaration that the deceased should have unequivocally stated he was about to die, or state that he realized that his death was impending. Any act or expression which clearly shows that the deceased realizes the seriousness of the situation and that he is *in extremis* is sufficient. Measured by this rule the statements of the deceased in this case that she felt she must die, and later calling for a priest to administer the last rites and to annoint her, she being a member of the Catholic church, clearly indicates that she visualized the situation, realizing that death was impending. Her statements afterwards made that her husband gave her paris green for her bowels was properly admitted as her dying declaration.

It is next complained that the trial court erred in sustaining objections to certain questions pertaining to a certain insurance policy carried upon the life of the deceased. The questions were intended to elicit answers relative to a suicide clause in the policy. We have carefully examined the evidence and considered the ruling of the court thereon, and are of opinion that no error was committed in this respect.

Complaint is also made that defendant was not allowed to show that the prescriptions given by Dr. Dingby to appellant a few days before the death of his wife, designated medicine ordinarily used for kidney and bladder trouble with which defendant claimed to be afflicted. We have considered the applicability and relevancy of this evidence and are unable to see why it was important. We do not think it germane to the subject under investigation in the light of all the circumstances.

Appellant also called Dr. Ricketts as a witness and propounded to him certain hypothetical questions concerning the psychology features of the case, to which questions objections were sustained by the court. Psychological questions sometimes enter into the consideration of criminal cases, but we conceive it utterly impossible for a psychologist or other scientists, under the limited facts embraced in the hypothetical questions propounded to determine with a degree of certainty upon which to base an opinion that the deceased did or did not commit suicide.. The doctor's opinion could have been nothing more than conjecture. The record contains the questions propounded and avowals made which we have

examined, and these but confirm our opinion that the jury would not have received competent evidence upon which it could, with reasonable certainty, have laid hold in the consideration of its verdict, had the court allowed the doctor to answer the hypothetical questions.

After the defendant had left the stand he was re-called for the purpose of correcting a statement with reference to the time he left his home in the afternoon before the death of his wife. He is not accused of being present at the time of her death. Whatever he did, if anything, to induce her death, was done on the evening before. Whether he remained all day at his house on Saturday, the day of her death, is wholly immaterial, and the court would not have committed prejudicial error had it declined to allow him to correct an immaterial statement. From the reading of the record, however, we are convinced that the facts were placed before the jury.

The defendant was accused of murder by administering poison to his wife. If she took sick and died a natural death he was not responsible nor was he accountable if she committed suicide, or took the drug by accident. It was, therefore, unnecessary, if indeed not improper, to again have instructed the jury to find the defendant not guilty if the deceased came to her death by suicide, in view of the fact that the jury was instructed that defendant could only be found guilty if the jury believed, from all the evidence, to the exclusion of a reasonable doubt, that defendant had administered the poison, and in any other event to find him not guilty. Another instruction told the jury to find the defendant not guilty, if from all the evidence, they entertained a reasonable doubt of his guilt. The instructions fairly submitted the only questions for the consideration of the jury, and they were—did the appellant furnish the paris green to his wife to be used internally by her for medical purposes, and did her death result as a consequence, she being ignorant of the nature of the drug? If he did not do so, he was not guilty, if he did furnish the drug in the manner aforesaid, then he was guilty of murder, These questions were properly presented to the jury for their consideration, and appellant was found guilty. We do not hesitate to concur in the finding of fact made by the jury from all the evidence.

No prejudicial error having intervened, the judgment is affirmed.