## Winstead v. Commonwealth.

(Decided June 23, 1922.)

### Appeal from Rockcastle Circuit Court

1. Criminal Law—Review.—This court, under section 281 of the Criminal Code, is without jurisdiction to review the action of the trial court in summoning jurors from an adjoining county to determine whether or not he abused the discretion in such respect conferred by section 194 of the Code.

2. Criminal Law—Res Gestae.—Evidence that a witness who heard the shots which killed deceased, saw the wife of the defendant running toward the place of the shooting, as he was hurrying in that direction, held competent as part of the res gestae, or at

least not prejudicial where she was permitted to explain her action, and thereby corroborate, as she otherwise could not have done, her husband's explanation of his presence there for a purpose not related to deceased's presence at the place.

3. Homicide—Dying Declarations.—A written declaration not signed or shown to have been read to and approved as written by decedent, is not admissible as a dying declaration.

4. Homicide—Dying Declarations.—While error to permit such declaration to be read to the jury, same was not prejudicial where the statements contained therein were also made to other witnesses at different times and proven orally by such other witnesses.

5. Homicide—Dying Declarations.—Oral proof of declarations to other witnesses not rendered incompetent by a written declaration, especially where the latter is incompetent because not signed or approved by declarant.

6. Homicide—Dying Declarations.—Statements of facts and circumstances not immediately connected with the act of killing, but relating to previous distinct transactions are not admissible as dying declarations.

7. Criminal Law—Argument of Counsel.—Statements of counsel employed to assist in the prosecution, of doubtful propriety, held not prejudicial.

B. J. BETHURUM, L. W. BETHURUM and WM. LEWIS for appellant.

CHAS. I. DAWSON, Attorney General, and THOS. B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CLARKE—Affirming.

This is an appeal by the defendant from a judgment of the Rockcastle circuit court fixing his punishment, in accordance with the verdict, at confinement in the penitentiary for life for having shot and killed Watt Norton, in August, 1921.

The grounds upon which a reversal is sought are, (1) error of the court in summoning the jury from an adjoining county, (2) admission of incompetent evidence over the objection of the defendant, and (3) improper conduct of counsel employed to assist in the prosecution.

In presenting the complaint that the court erred in summoning the jurors from an adjoining county to try the case, after the regular panel had been exhausted, counsel for defendant admit that by reason of the provisions of section 281 of the Criminal Code this court is without jurisdiction to review the action of the trial court in this respect, and this court has uniformly so held

in many cases, among which is the recent case of Logan and Tribble v. Commonwealth, 174 Ky. 80, 191 S. W. 676.

Hence this assignment of error must be overruled in any event, although we think it fair to say that the record fails to show that the court abused the discretion conferred upon it in this respect by section 194 of the Criminal Code.

The first complaint with reference to the admission of incompetent evidence is, that George Bray, who heard the shooting and was among the first to arrive upon the scene of the difficulty, was permitted to testify that immediately after he heard the shooting and as he was hurrying in that direction, he saw the wife of the defendant running down the road about as fast as she could run, from the direction of her home and in the direction of where the killing occurred.

Not only was this evidence competent in our judgment as a part of the *res gestae,* but, even if this were not true, its admission could not have proven prejudicial, and was in fact beneficial to the defendant, since she was introduced by him in rebuttal and permitted to explain her presence out in the road at the time, and her testimony, which otherwise would have been incompetent, corroborated her husband's explanation of how he happened to be at the place where the difficulty occurred, and for a purpose not in any way connected with the presence of the deceased there at that time.

The next complaint under this head is more serious, because the court did err in permitting John Scott to read to the jury what he had written down upon a paper as the dying declaration of the decedent, which was not signed by or shown to have been read to and approved by him. Saylor v. Commonwealth, 97 Ky. 184, 30 S. W. 390; Fuqua v. Commonwealth, 73 S. W. 782, 24 Ky. Law Reporter 2208; Saulsberry v. Commonwealth, 107 S. W. 774, 32 Ky. Law Reporter 1095; Lucas v. Commonwealth, 153 Ky. 424, 155 S. W. 721; Eastridge v. Commonwealth, decided June 2nd, 1922, and not yet reported.

But, even though this was error, it is insufficient to authorize a reversal under the express provisions of sections 340 and 353 of the Criminal Code, unless upon a consideration of the whole case this court is satisfied that the substantial rights of the defendant have been prejudiced thereby. This rule is applicable to all errors upon a trial resulting in a conviction, and its applicability to

this particular error was expressly recognized in the Saulsberry case, *supra,* upon which appellant chiefly relies, in the Eastridge case and in some of the others cited above.

Hence, in order to determine whether or not the error was prejudicial here, it will be necessary to state as briefly as we can the substance of such parts of the evidence as we consider of sufficient importance to affect the question materially.

A pronounced unfriendliness had existed for some time between the defendant and the members of decedent's family by reason of a litigation over a road, and defendant's feeling toward the deceased was particularly hostile by reason of some statements he had heard decedent had made about his having accused another of stealing his watermelons, and the Commonwealth proved that the defendant, upon the morning of the day of the difficulty, said, in discussing this matter and referring to the deceased, "The boy is much larger than I am and younger than I am, but I would like to tangle with him. Of course he is larger than I am, but that don't matter a damn, I am always ready for him, but being a boy I hate to say anything to him about it, but if it was his Uncle Joe or one of the older boys, I would tangle with them over it."

The killing occurred about one o'clock in the afternoon, in the public road, almost directly opposite a walnut tree where defendant's farm adjoins the Skaggs creek church lot. Deceased, a short time before, had gone from the home of his father along this road, past the house of the defendant and the place of the killing, to the home of Green Cress for the purpose of getting a road scraper, making the trip in a wagon drawn by two mules, and the killing occurred as he was returning with the scraper in the wagon.

The only witnesses who saw what happened, although quite a number heard the shots and arrived upon the scene a few minutes thereafter, were the defendant, who testified in his own behalf, and the deceased whose dying declaration was introduced. Many facts and circumstances, however, were proven, all of which in our judgment tend almost as strongly to prove, as does the dying declaration of the deceased, that the killing was deliberately planned and carried out by the defendant without

provocation or excuse, and which contradict defendant's version of self-defense.

Tracks of a man and expectorations of tobacco amber were found just inside defendant's field at the walnut tree, which indicated that some one had been stationed at that point recently and for at least a brief time, and that this person had ridden a horse at a gallop from the place toward the rear of defendant's farm. The wagon tracks swerved abruptly toward the opposite side of the road just opposite the walnut tree, and deceased was found by the first arrivals, unarmed, lying on the opposite side of the road at this place, with a shot, which defendant admits he fired, in his left side, that penetrating his abdomen, ranged slightly upward.

Defendant admits that immediately after the shooting, and in the short interval before any of the witnesses reached the spot (one of whom was only about 300 yards distant and ran there immediately upon hearing the shooting), he got on his horse just inside the fence near the walnut tree and rode to the rear of his farm. He says, however, that he did not see deceased pass his house in the wagon going toward the home of Cress for the scraper, and that he was standing at the fence, but on the outside, fixing up the bars, after having let some mule colts through, when deceased approached on the return trip with the scraper, and that he "jumped off of his wagon and says, 'God damn you, you have accused me of lying,' and I says, 'How is that, Watt?' and he says, 'You say you never accused George Bray of stealing your watermelons, and whenever you told that you told a God damn lie,' and he grabbed me and shook me and pulled me down a little bit, and hit me in the breast and knocked me down."

He was then asked and answered: "Q. Where were you and he at the time he had hold of you? A. Standing right here by the corner, facing to him. Q. Now were you on the inside or the outside of the fence at the time? A. I was on the outside. Q. Where was your horse? A. Standing on the inside, hitched to a chestnut limb. Q. To a chestnut tree standing there? A. Yes, sir, standing right above there. Q. You say he grabbed hold of you, how? A. Well, I could show you if I had somebody, just grabbed me right this way by the shoulders or the arms. Q. Now, you say after he got out of the wagon and got hold of you there he hit you; did you say he hit

you? A. He hit me in the stomach with his fist, right in here. Q. What effect did it have? A. It knocked me almost down. Q. What did you do then? A. I went to get up and he threw a rock at me, and when he threw that rock at me, I seen it hit the ground right at me, and it hit my hat—my hat had fell off—and I looked and he was getting another rock, stooped down right over here getting another rock on this side of the road, and I pulled my pistol and shot him. Q. What position were you in when you shot him? A. Something like this. (A half kneeling position.) Q. What position was he in? A. He was stooping down to get a rock. Q. How far were you apart at the time the shots were fired? A. I never measured, just have to guess. I was here at the side of the fence and he was about even with the far wagon track, and it must have been between twelve and fourteen feet, something along there; I am just guessing at it. Q. About how much time elapsed, do you think, from the time he first got out of the wagon and got hold of you until you shot? A. Well, it wasn't long, he just come up and grabbed me and struck me, and you know it was done pretty quick. It must not have been over two minutes. Q. Well, what did he do or say, if anything, after you shot? A. He fell there on his right hip. Q. Did he say anything. A. Yes, sir. Q What was it? A. He says, 'Jim, I give it up, don't shoot me no more.' Q. And then did you shoot any more? A. No, sir, I never. Q. What did you do immediately after he fell and made that remark? A. I got over the fence and got on my horse. Q. Where did you go? A. Rode out to the far end of the pasture field and pulled the bridle off the horse. Q. Now, there has been some testimony describing the horse tracks up through the field. Tell the jury how you rode? A. Rode in a trot.''

The fact admitted by the defendant, who was 38 years of age and had been jailer of his county, that after shooting the deceased, who was about 23 years of age, and after deceased had said to him, ''Jim, I give up, don't shoot me no more,'' he got on his horse and rode away at a trot and left even an enemy lying on the side of the road unattended and mortally wounded, is decidedly out of keeping with the only defense offered by him, that he shot only in his necessary self-defense. The proverb that ''The wicked flee when no man pursueth; but the righteous are bold as a lion,'' truly expresses human experience throughout the ages.

Then, too, the abrupt swerve in the wagon tracks in the road opposite the corner of defendant's field from which he fled, indicates that the shots were fired when the wagon was at that place, and this could hardly have been so if defendant's version of what occurred is true, since seemingly the wagon and team would have been between the defendant and deceased when the shots were fired.

These facts and others thoroughly established, it seems to us, sustain the verdict, despite the contrary evidence for defendant, and without regard to the dying declaration made by deceased to John Scott, which was erroneously read to the jury. Declarations of deceased to other witnesses at different times were proven, which were made under such circumstances as rendered them admissible, as counsel for defendant admit, but they insist that the declarations recited by these witnesses were incompetent and erroneously admitted over their objections, because of the erroneous admission later of the written declaration. This contention is upon the theory that both oral and written declarations of deceased are not admissible, and that where the Commonwealth elects to, or can, introduce a written declaration, it being the best evidence, is alone admissible. In support of this proposition, but only where the written declaration is competent, there is some authority, although even upon this proposition reason and the weight of authority are to the contrary. Hendrickson v. Commonwealth, 24 R. 2173; Hines v. Commonwealth, 90 Ky. 64, 13 S. W. 445; Saylor v. Commonwealth, *supra;* 21 Cyc.. 979; 1 R. C. L. 531.

But it would be a strange perversion of the rule contended for even if its soundness were conceded, to exclude otherwise competent oral evidence, and especially of other declarations by decedent, because of the written declaration when it was incompetent, since it is only upon the ground of its competency and supposed superiority as evidence that the oral declarations are excluded when a written one is available in any of the cases.

The declarations of deceased to witnesses other than John Scott do not differ materially in any respect from the statement the latter transcribed and read to the jury, although some of them are not as full as the written statement, but considered together, they cover in every

respect and are in accord with that statement. The written statement as read to the jury is as follows:

"Wat Norton states that James Winstead was in the coal house as he passed the house and James Winstead went into the house. He states that he was going to Green Cress' to get a road scraper and as he came back he was over on the inside of the fence near the church house and he stopped me and asked me if I had been lying on him, and I told him I had not, and he said, 'By God, he lived here,' and he pulled his pistol and shot me twice, and went to shoot me again and I threw up my hands and begged to him not to shoot me any more and he got on his horse and run out through the field. Nobody was present when it occurred. He states further that he was in the wagon sitting in the seat and had no gun or made no attempt to fight."

It therefore appears that the contents of the written statement erroneously read to the jury, were otherwise competently proven, and this fact, considered with the other convincing proof of defendant's guilt, forces the conclusion that the error in admitting the written declaration could not have been and was not prejudicial to the defendant in this case.

It is next insisted that declarant's statement, proven orally and also contained in the written declaration, to the effect that defendant left his coal house and went into his residence as declarant passed in his wagon, was incompetent and prejudicial.

The rule sought to be invoked is thus stated and explained in 1 R. C. L. at page 535:

"It is a rule of general application that statements of facts and circumstances not immediately connected with the act of killing, but relating to previous distinct transactions, are not admissible as dying declarations. For declarations which relate to such transactions do not come within the principle of necessity on which such declarations are received. Therefore dying declarations by the injured party as to previous threats made by the accused, or as to previous attempts made on the declarant's life by the accused, are not admissible, for the declarant does not become a general witness. He can only speak of the transaction which caused the death, and such accompanying act, statements, and conduct as shed light on it; the *res gestae,* in a strict sense. Anything previously done or said, unless called up and made part of

the altercation, cannot be proven as a dying declaration; and when so called up it can be proved as such only to the extent it is repeated or uttered in the altercation. It does not legalize any statement by the declarant of the past transaction out of which the difficulty grew. It is only such acts or statement, done or uttered at the time of the final fatal encounter and catastrophe, and which tend to shed light on it as a part of the *res gestae,* which can be so proved. If the rule admitting dying declarations can be extended to a separate and distinct act occurring half an hour before, it will extend to any act done the day before, or a week, month, or year. As soon as the limit fixed by absolute necessity is passed, the principle upon which the exception is based being exceeded, there is no longer any limit whatever, and dying declarations become admissible, not merely to prove the act of killing, but to make every homicide murder by proof of some old grudge.''

The authorities cited in support of the text fully sustain it, and applying it here, our inquiry is, was defendant's action in leaving his coal house and going to his residence when decedent passed in his wagon ''a previous distinct transaction,'' or was it ''such accompanying act and conduct as shed light on'' the killing, and a part of ''the *res gestae* in a strict sense.''

If the defendant did not see deceased at the time, and simply went to the house to get a drink and then went to the place of the killing in attendance upon his stock as he testified, then doubtless this was evidence of a ''previous distinct transaction'' and therefore incompetent as a dying declaration.

But if, on the other hand, as is the theory of the prosecution, the defendant saw deceased as he passed in his wagon, and that was why he quit work in the coal house, went to his residence and thence to the place where the difficulty followed almost immediately, then defendant's action in leaving his coal house just as decedent passed was ''such accompanying act and conduct'' as not only to shed light upon how the killing occurred, but so immediately accompanied that act as that it constituted a central and vital element in the one transaction, and therefore probably formed an important part of the *res gestae* in a strict sense.

The fact that deceased saw defendant at his coal house as he passed (and he could not have known of his

presence there if he had not seen him), is evidence from which it might reasonably be inferred that defendant saw him, despite his denial.

That this evidence possessed such potency is apparent, and the recognition of that fact by counsel for defendant no doubt prompts the effort to exclude it.

But even if it be conceded this statement of declarant was not of the *res gestae* and therefore incompetent, its admission was not prejudicial, because any inference deducible from it, is even more readily drawn from defendant's own evidence.

He testified that he ate his dinner about twelve o'clock, sat in the shade talking to a neighbor for awhile, then shovelled back coal in his coal house for about half an hour until about one o'clock; that he then went to his residence to get a drink and "put on my pistol and my coat" and went to the place of the difficulty to turn some colts from one pasture to another. As the killing occurred at about 1:15 to 1:30 p. m., or within fifteen to thirty minutes after defendant left his coal house, it is apparent that he was in or about the coal house or his residence when deceased passed, and where he could have seen or heard the wagon. And the fact testified to by him that he put on his pistol and coat, when he says, he went to turn out his colts just after decedent had passed, furnishes a stronger basis for the inference that he saw him pass than does the fact that deceased saw him.

The statements made by special counsel for the prosecution complained of, are as follows:

"The deceased did not attack the defendant as claimed by him, because the deceased knew at the time that the defendant was armed, and was in the habit of going armed.

"I have seen men sent to the gallows without a single eye-witness, and to the penitentiary for life on entirely circumstantial evidence, and oftentimes on the testimony of only one witness. I have seen, and you have too, where a man was hung, and before death they had confessed where they had denied the crime on the witness stand. Counsel for the defendant, Judge Lewis, in making his argument said, 'Oh, they will talk to you about lawlessness and all of that.' I wonder if Judge Lewis, when he was circuit judge, in giving his charges to the grand juries and trial juries, gave them that way."

The latter of these statements was so plainly but an argument based upon an assumed common experience of all mankind, and not upon any facts claimed to have been established by the proof, that we are sure it could not have been otherwise understood by the jury, and that it could not have been prejudicial, even if it can be regarded as improper, which in our judgment is at least doubtful.

The other statement, that deceased did not attack defendant as claimed by him, is supported by much evidence, both direct and circumstantial, but there is no direct evidence that deceased knew defendant was then armed or that he was in the habit of going armed. That he was armed at the time was of course proven, and that he was in the habit of going armed is reasonably inferrable from the evidence. Defendant, himself, testified that when he left his house to change his colts from one pasture to another, he "put on my pistol and my coat" just as though it was as natural and customary to put on his pistol as it was to put on his coat when leaving the house for any purpose.

The only vice, therefore, if any, in this statement is that deceased knew of these proven and inferrable facts, and that because of such knowledge was not the aggressor at a time when he was unarmed.

Assuming, but not deciding, that all the proven facts and circumstances did not warrant the inference that decedent knew that defendant was armed at the time or in the habit of going armed, we are yet confident that defendant's version of the killing is so thoroughly discredited, not only by competent direct evidence but by all of the proven facts and circumstances, that this argument, if improper, could not have affected the verdict.

Summarizing, we feel entirely justified in saying that the only certain error appearing upon the entire record was the admission of the written declaration, and this was certainly not prejudicial because every statement therein was otherwise completely proven; that the evidence is so convincing of defendant's guilt that the other matters complained of, and about the propriety of which we have expressed some doubt, could not have affected the verdict, and that the trial was free of any error prejudicial to defendant's substantial rights.

Judgment affirmed.