## Daughters v. Commonwealth.

(Decided June 22, 1934.)

ROBINSON & KAUFMAN and J. E. ROBINSON for appellant.

BAILEY P. WOOTTON, Attorney General, and DAVID C. WALLS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

A. M. Daughters appeals from a judgment convict-

ing him of manslaughter and fixing his punishment at two years' imprisonment.

The homicide occurred at Kennedy's Bridge in Garrard county about 6:30 o'clock on the morning of July 7, 1932. Appellant's wife owned a small tract of land and several cottages, which were rented to persons visiting Herrington Lake for fishing and other recreational purposes. Appellant and his wife also owned several boats which they rented to visitors. In connection with their resort they operated a small store in which they sold soft drinks, tobaccos, and a few groceries, and also conducted a lunch counter. The store room is 15 feet wide and 20 feet long, and faces the highway on the north. Across the highway is another store owned by a Mr. Dunn and managed by I. S. Lowe. There are two windows in the Daughters store and a door in the center with a porch about 8 feet wide. The counter, which is 15 feet long and 2 feet 10 inches wide, was 21 inches from the front of the store and 33 inches from the wall, thus leaving a passageway between the front wall and the counter. Next to the front wall was a cigar case 4 feet 4 inches long. When the front door was unlatched, it swung back against the counter, closing the entrance going behind the counter. Underneath and behind the counter, and about 9 feet from the front wall, was an ice box used for cooling soft drinks, and on which appellant kept his books and a pistol.

The deceased, James Montgomery, was employed by appellant and his wife for a certain compensation to clean up the camps, keep the grounds and boats in order, and look after the boats belonging to visitors. He was also furnished a cottage for which he agreed to pay $7 per month rent in advance. Not long after he started to work he had a misunderstanding with Mrs. Daughters, and later on met appellant, and drew a pistol on him. Thereafter appellant got out a peace warrant for the deceased, and he was placed under bond to keep the peace. In a short time their difference appears to have been patched up, and the deceased returned to work. The morning of the homicide deceased appeared at appellant's store and asked for a settlement. The two then went into the store. There seems to have been no difference in their accounts, with the exception that appellant claimed $7 for rent, which the deceased claimed should not have been de-

ducted. Deducting the rent, there was due the deceased $12.98, and appellant handed the deceased across the counter a $10 bill and three $1 bills. At this time a discussion arose as to the amount due, and appellant picked up his pistol and fired four shots. The first shot, which appellant claims was accidentally fired, did not strike the deceased. Three of the shots took effect, one striking the deceased between the elbow and the wrist, another striking him under the left arm and coming out in front, the third striking him in the spinal column and causing his death.

According to I. S. Lowe, who conducted the restaurant across the road, he heard the shots fired, and the deceased calling to him. On entering the store, he found the deceased lying behind the counter about 5 feet from the front door. He was sitting up with his arm against the side of the house and the ice box on the other side, with his feet turned toward the road. He took hold of the deceased under his arms and pulled him out. When he entered, the front door was closed, and there was no one else in the store. Appellant opened the door, and he dragged deceased out. There were blood stains near the ice box. Afterward the deceased was carried to the hospital. According to the nurse and the physicians, who attended him, the wound in the back of the deceased paralyzed him from the waist down, and there was never any chance of his recovery. In addition to this, the deceased said to several witnesses that he believed he was going to die. Roy Graves, county attorney of Mercer county, accompanied by Mrs. Lotta Bell, a stenographer, took the dying statement of the deceased. The questions and answers were taken down in shorthand by Mrs. Bell and transcribed by her, but were not signed by the deceased. After looking at the statement and refreshing his recollection, Mr. Graves testified in substance as follows: He asked Mr. Montgomery if he realized his condition, and Montgomery said that he did, and he believed he was going to die. He then asked Montgomery what took place and how he came to be shot. Montgomery said that Mr. Daughters owed him money which he refused to pay, and he told Mr. Daughters that he was going to sue him, and Mr. Daughters then shot him in the back. As he remembered, the deceased said Daughters shot him twice, and that he was trying to catch

Daughters at the time. Mrs. Lotta Bell testified that she took down and transcribed the statement made by James Montgomery and that the statement was correct. She then read the questions and answers to the jury. After stating that he believed he was going to die, he gave the following account of the transaction:

"Wait a minute—I will try to tell you. He owes me some money—it had been running on and he wouldn't let me have any money—I told him I had to have it—he said he wouldn't pay me—I told him I would have to go ahead and sue him—he said he wasn't going to fool with me any longer and was going to kill me—he shot me under the arm—I tried to catch him and he shot me under—I tried to keep him from killing me—but he killed me—he shot me in the back—I fell and he shot me in the back.

"7. Did he shoot you more than once? A. Twice—under arm—in my back."

According to William Montgomery, brother of the deceased, he was with the deceased practically all the time he was in the hospital. The deceased told him that he was going to die, and then made substantially the following statement: Appellant was supposed to pay him on the 1st, but said he did not have the money, and asked him to wait until after the Fourth of July. He waited until the 7th, and on that day appellant said he would settle with him. Appellant had his money lying on the counter. It was $12.75. He told appellant that that was not all the money he owed him. Appellant said, "It is all you are going to get." He said, "Here is the book, I want to show you that you owe me more." Appellant said, "I am not paying any attention to no book, that's all the money you are going to get." He then told appellant that he was going to call the sheriff and get his money. He then caught hold of the lock and heard the pistol click. Appellant whirled around and shot him "there and there." He turned around and got hold of the knob again, and appellant shot him again. When he fell, appellant shot him "right down that way" in the back, and commenced kicking him in the face. When appellant went to kicking him, he pulled appellant's head behind the counter and kept him from kicking any more. He fell, and appellant ran back to the

door and said, "I have got him." On cross-examination the witness testified that his brother told him that Mr. Daughters was over behind the counter all the time he was shooting at him, and that he fell down and Daughters shot him. His brother also said that he had hold of the doorknob trying to open the door when he was shot in the left arm. The witness also admitted that he testified on the first trial that his brother stated to him that there were some things he was not telling him about. He also testified to the same effect. His brother also said that he did not want anybody except him to hear what he was saying, that he did not want the nurse to hear it, and added, "He said he was going to die and did not want anybody to know, but he wanted me to know how it happened."

On the other hand, appellant, after describing the business in which he was engaged, the character of the work done by the deceased, and the terms of his employment, telling of the discussion as to the settlement, gave the following account of what took place at the time of the homicide: He had trouble with the deceased every time he settled, and he paid him to keep out of trouble. The deceased had told him several times that he was a boxer and a wrestler. On the morning of the homicide, the deceased appeared and said that he wanted a settlement in order to buy a license for his brother's car. He told the deceased to come in and they would settle. The door was standing open and leaning against the showcase. He went behind the counter and got his book. Deceased had his book and figured that he owed him $27.93, and admitted that he owed appellant $14.95. Appellant then gave deceased $10 and three $1 bills. Deceased took the money, put it in the book, and threw it on the counter and said, "I am not going to pay you rent money, I am coming around and cut your damn head off." Appellant said, "Don't you come behind the counter, Dude (deceased)," and deceased grabbed for the door. Appellant then grabbed for his pistol. The deceased was coming around behind the counter and made a lunge for him, and he was shooting to hit the deceased anywhere he could. When the deceased took hold of the door, it was opened back against the counter. He did not know whether the deceased closed the door when he came back or not. The deceased finally got behind the counter. The deceased was coming at him with both

hands, and he was trying to get away from the deceased and was firing. The time he fired the last shot he was about 3 feet from the end of the ice box. The deceased had hold of him by the leg when he fired the last shot. He shot the deceased because deceased threatened to kill him. He was old and unable to defend himself. When Mr. Lowe came in, he had to close the door to get behind the counter. When Mr. Lowe came in, deceased was lying right there on his face with his hands folded under him. The first shot was accidentally fired, but the other shots were aimed at deceased the best he could. The deceased said, "I am coming around there and cut your damn head off," and put his hand on the door so that he could get around the counter. During all this he had seen no weapon in Montgomery's hand. He did not try to go near the deceased until after Mr. Lowe came. The witness refused to take a pistol and demonstrate how he shot the deceased. There was further evidence that the only blood found on the floor was behind the counter at the place where the witness Lowe testified that he found the deceased when he went into the store. There was further evidence that the deceased had threatened appellant and that appellant's reputation for truth and veracity was good.

One of the grounds urged for reversal is that the dying declarations were improperly admitted. In view of the fact that the deceased had received a wound which paralyzed him from the waist down and caused his death, and repeatedly stated to the witnesses that he was going to die, we think the preliminary proof that the statements were made under a sense of impending death was sufficient to authorize their admission as dying declarations (Stephens v. Commonwealth, 47 S. W. 229, 20 Ky. Law Rep. 544; Burnett v. Commonwealth, 172 Ky. 397, 189 S. W. 460; Ulrich v. Commonwealth, 181 Ky. 519, 205 S. W. 586), unless inadmissible on some other ground, a question which we shall proceed to discuss. The statement taken down in shorthand and transcribed by Mrs. Bell was not signed by the deceased or read to him and approved, or in any manner recognized by him as a correct statement of what he had said, and, where that is the case, the statement is not admissible as a dying declaration, and it was error to permit Mrs. Bell to read it to the jury. Saylor v. Commonwealth, 97 Ky. 184, 30 S. W. 390, 17

Ky. Law Rep. 100; Fuqua v. Commonwealth, 73 S. W. 782, 24 Ky. Law Rep. 2208; Sailsberry v. Commonwealth, 107 S. W. 774, 32 Ky. Law Rep. 1085; Lucas v. Commonwealth, 153 Ky. 424, 155 S. W. 721; Eastridge v. Commonwealth, 195 Ky. 126, 241 S. W. 806; Winstead v. Commonwealth, 195 Ky. 484, 243 S. W. 40. It is true that the admission of such a statement is not always prejudicial, as where there are other dying declarations and other facts independent of the statement sufficient to sustain the verdict, as was the situation in the case of Winstead v. Commonwealth, supra; but that is not the situation here. Though it was proper for Mr. Graves, the county attorney, who was present and heard the statement, to testify to what the deceased said, and to use the paper to refresh his memory (Sailsberry v. Commonwealth, supra), his evidence fell short of what was contained in the statement, and, outside of the dying declarations, there was but little evidence other than the attendant circumstances. In view of these circumstances, we think the admission of the written statement was prejudicial error.

With respect to the dying declaration alleged to have been made in the presence of William Montgomery, brother of the deceased, we have an unusual situation. Though the nurse was going in and out of the room, the declarant stated that he did not want any one else but the witness "to know how it happened." What effect this statement, standing alone, would have on the dying declaration, we need not determine. It is admitted by the witness that the declarant said that he was not telling him all that occurred there, but did not say what it was he was excluding. It is not a case where the declarant declined to answer on the ground that he was a dying man. People v. Chin Mook Sow, 51 Cal. 597. It is not a case where the declarant was prevented from stating only that which would have been excluded if the statement had been made. Chittenden v. Commonwealth, 9 S. W. 386, 10 Ky. Law Rep. 330. Nor is it a case of rejecting the statement of the declarant upon any presumption of law that he was precluded by his situation from giving a full and complete account of the transaction, or upon any presumption of fact that the court could form, that what was disclosed was only a part of the truth and not the whole truth of the case. 1 R. C. L. 534; State v. Patterson, 45 Vt. 308, 12 Am. Rep. 200;

Vass v. Commonwealth, 3 Leigh (Va.) 786, 24 Am. Dec. 695; State v. Mayo, 42 Wash. 540, 85 P. 251, 7 Ann. Cas. 881. On the contrary, it is admitted that the declarant stated that he was not telling all that occurred, and that he did not want any one else but the witness to hear how it happened. The general rule on the subject is that, whatever the statement may be, it must be complete in itself, and, if the declarations appear to be intended by the dying man to be connected with and qualified by other statements which he is prevented by any cause from making, they will not be received. 1 Greenleaf, Evidence, sec. 159; State v. Patterson, supra. It is true that the statement will not be rejected on the ground of incompleteness, if it appears that the declarant said all that he desired or intended to say. But we are not willing to apply the rule to a case where the declarant, though saying all that he intended or desired to say, intended that the statement should be incomplete. We therefore hold that a secret statement designed by the declarant to be a part only of a complete account of the transaction, the whole of which he was able to give, ought not to be admitted in evidence, and where, as here, the statement contains many damaging facts, there can be no question as to its prejudicial character.

The necessity for a reversal on other grounds renders it unnecessary to determine whether the verdict is sustained by the evidence.

Judgment reversed, and cause remanded for a new trial consistent with this opinion.

Whole court sitting.