ROUSE *v.* THE STATE.

552

No. 11450.   November 18, 1936.

R. A. *Harrison* and R. *Earl Camp*, for plaintiff in error.

M. J. *Yeomans, attorney-general*, J. A. *Merritt, solicitor-general*, and *George L. Goode*, contra.

Beck, Presiding Justice.  Tom Rouse was indicted for the murder of Jim Ford.  The jury returned a verdict of guilty, with a recommendation.  He made a motion for new trial, which was overruled, and he excepted.  In addition to the general grounds, the motion complains that one of the jurors who tried the case was not impartial, because he had previously formed and expressed an opinion as to the guilt of the defendant; and two grounds complaining of the charge delivered by the court.  The evidence is to the effect that the deceased, the accused, and a number of other negroes were in attendance on a meeting at Marion Church on or about August 11, 1935.  The killing occurred in the evening after they had arrived at the church.  The hour is not definitely fixed, but it was shortly after dark.  The deceased was cut about the head and neck, seventy-five to one hundred yards from the church, where he remained for a short while, and died before reaching his home, where he was carried in an automobile.  According to the record, no one of the witnesses actually saw the defendant cut the deceased.  Clarence Bryan testified that he saw the defendant and the deceased going "up the road."  He did not hear anything said.  He went later to the place where the deceased was cut, and

immediately went from there and informed a brother of the deceased of what had happened. Warren Wimberly, who drove to the meeting-house the truck that carried the defendant, testified that defendant said that he wanted to see Jim Ford about cursing before his sister, and that .Ford was up the road somewhere. Witness did not see the defendant follow the deceased, but did see him come back to the truck, and defendant said that he was drunk, and he acted like a drunk man. He said when he returned that he "cut him, and he fell, but he did not hurt him." It seems from the evidence of this witness that the defendant came alone from the direction where the man was cut, and upon his return made the statement that he had cut some one who fell when he was cut.

Lewis Ford, a brother of the deceased, testified for the State, that he saw the deceased down the road, that the defendant was down there too; that they were arguing a little, but he did not know what they were arguing about; that the deceased told him that Tom Rouse, the defendant, cut him, but did not say about what; and that his brother, the deceased, died on the way home. Robert Hill testified that he went to where the man was cut, when they were fixing to take him home, and "I asked what the trouble was, and he said Tom Rouse cut him. He said, 'Tom cut me and has done kilt me.' He didn't say anything else. I saw a place on his neck where he was cut, and he was bleeding bad, and praying 'Lord have mercy.' He was praying when I got there."

There was testimony on behalf of defendant, by his brother, that the deceased said, in the presence of a woman named Hennie Stevens, that he was cut by little Robert Hill. Hennie Stevens testified that the deceased never did say directly that Robert Hill cut him, and that she did not tell any one that Robert Hill cut him. Another witness, Buddie Anderson, testified that he saw two people "tussling in the road," and that he did not say that the defendant was the one fighting with Jim; and that he did not know when the cutting took place. On cross-examination he testified that he saw the defendant coming from toward the church and going toward where he was stopped by his sister-in-law and brother; that his sister-in-law told him that Ford was down there and raising sand and cursing, and told him not to go down there —that he would get in trouble if he did. This witness quoted the

defendant as saying at that time: "Jim Ford, I am going down there. The God damned little son of a bitch, he is mean as the devil, cursing before my sister. I am going down there and cut his damn throat." That was before Jim was cut. His sister-in-law caught him by the coat-tail and tried to beg him not to go down there, and she saw he was going any way, and she let him. He went on down that way. A number of character witnesses were introduced in behalf of the defendant.

■ The evidence for the State is sufficient to authorize the verdict. The statement made by the deceased to Robert Hill was insisted on by the State as being a dying declaration tending to prove that the accused was the person who killed the deceased. It does not appear that any objection was made to this testimony at the time it was admitted, or that counsel for the defendant urged any objection to this testimony or to the manner of its being received before the jury. The Code, § 38-307, declares: "Dying declarations.—Declarations by any person in the article of death, who is conscious of his condition, as to the cause of his death and the person who killed him, shall be admissible in evidence in a prosecution for the homicide." It has been held by this court: "Consciousness on the part of the deceased that he was dying and was in extremis may be inferred, not only from his statements, but also from the nature of the wound and other circumstances. The actual period of survival after making the declaration is not controlling. The question does not depend upon the length of time between the declaration and the death of the declarant, but upon the declarant's mind at the time of the declaration, and his belief that he is in a dying condition. A prima facie case that deceased was in extremis and is conscious thereof is sufficient to admit dying declarations to the jury." *Johnson* v. *State,* 169 *Ga.* 814 (3) (152 S. E. 76). See also *Washington* v. *State,* 137 *Ga.* 218 (73 S. E. 512); *Fitzpatrick* v. *State,* 149 *Ga.* 75 (99 S. E. 128); *Bass* v. *State,* 152 *Ga.* 415 (110 S. E. 237).

■ ■ The rulings in headnotes 2 and 3 require no elaboration.

■ A ground of the motion for new trial is that one of the jurors sworn and impaneled to try the movant "was not a fair and impartial juror in that he had, previous to the trial of said case, expressed an opinion as to the guilt of the movant," having stated to a named person that "the jury would find the defendant,

Tom Rouse, guilty." It was also contended that the juror referred to showed that "he entertained bias and prejudice against the defendant that disqualified him by reason of passion and partiality as a fit and suitable juror for the trial of said case." It appears from the affidavits of two deponents that before the trial the juror referred to had said that "the jury would find the defendant, Tom Rouse, guilty." Conceding that this was an expression of opinion by the juror as to the guilt of the defendant, it did not require the grant of a new trial, in view of the fact that the juror had answered the voir dire questions at the trial; and it does not appear that, if the remark was made by the juror, it was such expression of an opinion which he had formed from seeing the crime committed or hearing evidence upon oath. "To disqualify one from being a juror in a criminal case, he must have formed and expressed an opinion, either from having seen the crime committed, or from having heard the testimony under oath. One who from some other cause has formed and expressed an opinion which is not fixed and determined, and who indicates his competency by answering the statutory questions on his voir dire, is not an incompetent juror. *Westmoreland* v. *State,* 45 *Ga.* 225; *Blackman* v. *State,* 80 *Ga.* 785 (7 S. E. 626); *Fogarty* v. *State,* 80 *Ga.* 450 (5 S. E. 782); *West* v. *State,* 79 *Ga.* 773 (4 S. E. 325)." *Wilburn* v. *State,* 141 *Ga.* 510 (3) (81 S. E. 444).

*Judgment affirmed. All the Justices concur, except Russell, C. J., who dissents.*