1. The preliminary evidence was sufficient to establish a prima facie foundation for admission of the testimony as to statements made by the deceased and offered by the State as dying declarations, and the statements shown to have been made were not inadmissible for any reason urged. The mere fact that the declarant lived for about three and a half months after making them was not controlling upon the admissibility of such statements.
2. Acquiescence or silence, when the circumstances require an answer or denial or other conduct, may amount to an admission. When a statement tending to incriminate a person is made in his presence and he remains silent, the mere fact that he is under arrest or is in custody at the time will not render evidence of such statement and silence inadmissible as an implied admission, or make it improper to instruct the jury in reference to such evidence.
3. Where an accused was on trial for the offense of murder, and there was evidence tending to show that he killed the deceased in the commission of a robbery, and also that on the occasion in question he came to the home of the deceased in an automobile and left by the same conveyance, evidence that he later admitted stealing the automobile in a different county in this State tended to illustrate the defendant's state of mind at the time of the homicide, and to corroborate the other evidence tending to show robbery as the motive, and was not subject to objection on the grounds that it was irrelevant and prejudicial, and placed the defendant's character in issue.
4. The charge in regard to the defendant's right to make a statement, and the authority of the jury to believe it in preference to the sworn testimony, when considered in the light of other instructions given in the general charge, did not tend to minimize or disparage the statement, and was not erroneous, as contended.
5. The instruction to the effect that if the defendant and another person killed the deceased in the commission of a robbery, the killing would be murder, was authorized by the evidence, and was not subject to exception on the ground that it was unsupported.
6. Under the evidence, it was not error to refuse to give a requested instruction to the effect that if from the evidence or the defendant's statement the jury should believe that the defendant did not in fact intend to kill the deceased they would not be authorized to convict him of murder.
7. It is declared in the Code that drunkenness shall not be an excuse for any crime or misdemeanor unless it was occasioned by the fraud, artifice, *Page 518 
or contrivance of another person for the purpose of having a crime perpetrated. The charge on drunkenness, as given on request of the jury for instruction relating to that subject, was not subject to the criticisms lodged against it.
8. The physical evidence that was introduced was sufficiently identified, and was properly admitted over the objections urged.
9. The evidence authorized the verdict, and the court did not err in refusing a new trial.
 No. 14400. MARCH 11, 1943. REHEARING DENIED MARCH 23, 1943.
Jesse Kalb and Thomas Emmett were jointly indicted for the offense of murder in the alleged killing of Guy McConnell in Hall County on January 29, 1942, by striking and beating him "with a certain shotgun and with a certain pistol, and with other weapons and instruments to the grand jurors unknown." On separate trial Emmett was convicted of the offense charged, without recommendation, and was sentenced to be electrocuted. His motion for a new trial, containing the general grounds and fourteen special grounds, was overruled, and he excepted.
The evidence and the defendant's statement tended to show the following: Emmett left Atlanta in an automobile on January 28, intending, as he stated, to go to Gainesville to see his "father's people." He soon "picked up" Kalb, a stranger, and invited Kalb to go with him. They drove by the home of Kalb's mother in Cobb County, and got $1.50 or $2.00. They then bought a pint of whisky, and proceeded on their journey. They got lost in Forsyth County, and stopped and spent the night on the roadside. A farmer in that county gave them breakfast on the morning of January 29; and while they were at his home they stated to him that they had been drinking the night before, and asked him where they could get some whisky. In reply, they were told to go across the river and stop at the first house and ask for Guy McConnell; that they could get some there. They proceeded to McConnell's home, and spent the greater part of the day with him or about his place. McConnell lived alone, and his home was in Hall County.
Cliff Jenkins, an employee of McConnell, testified that he and Loyd Wooten were at McConnell's place, hitching mules to a wagon for the purpose of going to Gainesville, at the time the defendants came; that they asked Wooten if he knew where "anybody could get them a drink," and he "told them he didn't;" that they then *Page 519 
walked up to the house and went in; and that they were still there when the witness returned from Gainesville about 3:30 in the afternoon. The distance to Gainesville was about nine miles. The witness further testified that when he drove to the barn and took out, he saw the defendants come out of the house through the back porch; that they came to the barn and wanted him to "push the car off;" that the car would not crank; and that Emmett said, "We had better get the mules. Emmett pointed a pistol at him and said, "This will get you." In view of this and other threats made by Emmett, the witness hitched one of the mules to the automobile and assisted in getting it started. At this time Kalb had a little gash on his chin and what appeared to be blood on his face. Emmett drove the car away, and Kalb went with him. The witness went to McConnell's house to tell him what had happened, and, after calling and receiving no response, decided that he "had better go and let the people know and see about where Guy was." He accordingly went to the house of a neighbor, who took him to Gainesville to notify McConnell's brother Glenn. When he returned with the brother, they did not find Guy.
The evidence does not show clearly when or how McConnell left his home; but from questions to witnesses it seems to have been thought that he walked to the home of another person, and was then taken by some one to the hospital in Gainesville.
Winfred Jones testified that he went with Glenn McConnell to Guy's home on the afternoon in question, and that Guy was not at home when they got there: He further testified: "In the room where Mr. Guy slept we found a gun stock laying on the floor, split, and the barrel lying on the bed like somebody had laid it over there. That is the barrel and stock, and those blankets lying on the floor; we got eight pieces, and I guess in eighteen or fifteen inches was a heavy pool of blood. . . There was a heavy pool of blood on the floor about eighteen inches from them. I got this blanket out of the house; it was on the bed, and we went back later and got it. It was torn like it is now. When we brought in Thomas Emmett he had this pistol on him. He walked out of the woods; he was trying to catch a ride, and he walked into the road, and Hollis, a State patrolman, and I got him. I took possession of the gun and turned it over to the sheriff's office. It *Page 520 
did not have any shells in it. I did not examine the barrel of this gun. I don't think it was loaded when I got it. . . The barrel part lay on the bed and the stock part lay on the floor. I found the car just across the road. It was a 37 Ford coupe, blue coupe. Mr. Lathem, I believe, found Kalb, Lee Lathem. He found him just a short distance from the automobile. When we got Emmett we were back this side of the river, but he walked out where the automobile was, where he had left it; he thought his car was there, but they moved the car he was driving, and another car was parked. The sheriff of Forsyth County took the car into Cumming. Emmett did not make any statement to me about the car. Mr. McConnell's little dog was in it when we found it. He was behind the front seat. The doors of the car were closed, but I think the glass was down. I didn't know the dog, but Mr. Glenn identified it. I turned the dog out, and I think it went back across the river home. . . I have seen that belt. It was lying on the floor broke like it is now. I brought it in with the other stuff. . . They searched him down at the jail and took two knives off of him. I did not see either one of them."
Lee Lathem testified: "I arrested Mr. Kalb. I found him just off of the road about a half-mile beyond Brown's Bridge — I guess fifty feet out in the woods. He was hid when I found him. He was in a brush pile. I arrested him and brought him to town. It was just before dark when I found him. He was not asleep when I found him — just lying there kinda of on his back sorta of like this. I imagine it was about fifty steps from the road. He did not resist arrest at all. I came up behind him. He did not see me until I was done up on him. He did not try to run. He was pretty bad beaten up, pretty bloody, beaten up on the head. There was blood on his clothes. I could smell whisky. He told me about a fight he had with Emmett. I came up from the back. . . I seen him lying there in the brush pile, so I sneaked around to the back and come in. I did not know but what he was the one had the gun. I reached in and pulled him out. He had a knife — this knife right here, and I asked him what was the matter — what had happened, and he said Thomas Emmett had beaten him up. I asked him what he beat him up with, and he said a pistol. I asked him where Emmett was, and he said he had gone this way, which was across a hollow through the woods. . . Kalb said he was afraid Emmett *Page 521 
was going to come back and kill him, and I asked him what he was doing with this knife in his hand. He did not tell me what the fight was about. He was afraid he would come back and kill him."
From other evidence, it appeared that both arrests were made in Forsyth County.
Dr. C. D. Whelchel testified: "Guy McConnell was admitted to the Downey Hospital on or about January 29th. . . The principal injury that I found was an injury to the right side of his head. It was a rather extensive scalp wound with a fractured skull. I made an x-ray of the fractured skull. . . Guy McConnell was in a very serious condition from the wounds. he was unconscious. I made an examination of him there when he was admitted. I was close enough to have smelled liquor on his breath, if he was intoxicated. I did not get any odor of whisky."
Dr. Lee Rogers testified: "I first saw Guy McConnell the morning after he was beaten up. I saw him at Downey Hospital. I looked at him. I did not take any bandages off. I looked at the chart and felt of his pulse and looked at the x-ray of his head. He had a fractured skull and several lacerations where his scalp and face were beaten up. He had two fractures of the skull, as I remember, one around his eye and ear and one up on this side. Those wounds on his head evidently caused a hemorrhage in his brain. This blood from that hemorrhage was never absorbed. As to how long after I saw him at Downey Hospital before he was removed to the Hall County Hospital, I don't remember the date the accident happened; he was moved to the Hall County Hospital February 6th. From that time until he died he was under my care. I do not think he was ever rational. He would have lucid intervals. He could probably recognize me part of the time, but it was very infrequent. He couldn't carry on a conversation. He was living in the past all of the time. He would have lucid moments when he could recognize certain people. His x-ray revealed very clearly that his skull was fractured. In answering the question, `From what did he die?' he had cerebral embolism — a clot from one of those vessels in the brain. That was produced from his skull. He died from the wounds inflicted on him on the occasion of his beating. That was the direct and proximate cause of his death. . . He died from a cerebral hemorrhage. He *Page 522 
had several of those. He would have those convulsions, and a number of times we thought he would die. Those blood-clots would break through. This hemorrhage was at the base of the brain, and those little clots broke loose and finally one hit a vital spot, and he went out. Sometimes he would recognize me. Sometimes he would have lucid intervals. I never thought he would recover from the time I first saw him. He never knew what he was doing. He never knew where he was. He might recognize a certain person, but it was just a fleeting thing; he never knew where he was. As to whether from my examination of him and the treatment at the time I first saw him, in my opinion as an expert I think he would know what he was saying — well, he lived in the past most of the time and he would recognize a certain individual, but he would talk of things that happened years ago, and I don't know whether it was true or not. He knew when he had pain. He could tell where he was suffering; and if he wanted a drink of water he could call for that, or if he was hungry he could call for that. No, he couldn't do that. . . If he made a statement on sit down and carry on an ordinary conversation, he couldn't do that. No, he couldn't do that. . . If he made a statement on the night after he was hit, say around midnight, it was not time for the fever to have started. At that time he could have had a lucid interval. And if the fever had started up and got very high on the next night, he could have had a lucid interval and known what he was saying."
McConnell lived about three and a half months after the wounds were inflicted, dying on May 14.
It appears that during the nights of January 29 and 30, being the first and second nights after he was injured, McConnell made certain statements tending to implicate "Emmett" and another "fellow." The testimony regarding these statements, offered by the State as evidence of dying declarations, was admitted over objections of the defendant. For this evidence, see grounds 1, 4, and 5 of the amendment to the motion for new trial, as shown later in this statement.
Sheriff Bell testified as to statements made to him by the defendant Thomas Emmett, and by the defendant Kalb in Emmett's presence. According to the sheriff's testimony, the defendants both admitted that they had robbed and beaten McConnell on the *Page 523 
occasion in question; his evidence as to this issue being as follows: "About the money, he said when he demanded he hand them the money, he handed it to them. Emmett made that statement. Emmett demanded it. He said they took his pistol and three knives. Mr. Kalb had one knife that belonged to him, and Emmett had two. They were pocket-knives. That is one of the knives. I don't see the knife Kalb had. It is down in the vault. All of this stuff has been in the jail. Since that day it has been locked in the vault of the jail. Emmett said that after McConnell was robbed and beaten up, they laid him on the bed. They both agree to that. They laid him on the bed, and they left. Kalb said in Emmett's presence that McConnell was not doing anything to either of them. He said there was never any difficulty between McConnell and either one of them, however he and Emmett had a fracas earlier in the day. It was sometime; I never did get that correct. Kalb said the shotgun was in Emmett's hands, the first he saw of it. He said Emmett first struck McConnell with it and then struck him. That statement was made when you [the solicitor-general] and I and Mr. Vickers were present. Emmett did not reply anything at all at that time, but later on he did in fact deny that fact. . . Emmett said that whatever the use of the gun, that Kalb used it and not him. Whenever I say gun I mean shotgun."
The court: Q. "You say Mr. Kalb was pretty badly beaten up also?" A. "He was, yes sir." The court: Q. "Was there ever any contention by either Emmett or Kalb that any one had hit Kalb except Emmett?" A. "No, sir."
On cross-examination, the sheriff testified, in part, as follows: "I don't know anything about Emmett and Kalb having a fight in Forsyth County, other than what they have told me. They told me they had been down at Guy McConnell's all day, drinking, all three of them. They said they came down there reasonably early that morning, and stayed all day. They did not say all drinking. I asked about Guy drinking. He said he was sick; and if he drank any, both of them said they did not know if he drank any. . . In my conversation with Thomas Emmett, when he made these statements to me that I have already testified about, he said he got that automobile they came up there in, in Atlanta. He did not say exactly what street he got it in, but he said he got it in Atlanta. *Page 524 
He said he stole it. The automobile was carried to Forsyth County, and from there delivered back to the owner." This evidence was admitted over objection that it was irrelevant and prejudicial and brought the defendant's character in issue. See ground 3 of the amendment to the motion for new trial, as dealt with in the opinion following this statement.
The defendant made the following statement to the court and jury: "Well, gentlemen, the way this thing came about, me and Kalb come up through Forsyth County and went over to Mr. Heard's house. We got lost in Forsyth County, and it was cold that night, and asked him about spending the night with him, and he said he had a sick boy, and we built a fire on the side of the road and spent the night. The next morning about daylight him and this boy come up where we was, and invited us out to the house to have breakfast, and we got to have breakfast, and he had some little chickens, and we got to talking, and he thought we had a load of liquor, and Kalb told him, no, we would like to buy a drink, we had been drinking the night before; and I kept on talking to him — and we kept on talking to him and talked to him about forty-five minutes or an hour, talking about the war; and Kalb asked Mr. Heard about where we could get some whisky did he know, and his son told this Kalb the first house after we crossed the river bridge, a man by the name of McConnell — a good barn to the left of the house, and we got some smoking tobacco, and our car was about torn up — it did not have a fan belt on it, and he told us, this man, it was seven and a half miles to the river, and we stopped at the house and went down to the barn where this fellow and boy were hooking up a pair of mules, and asked about whisky and told them Mr. Heard sent us over there; and the boy said he did not know, we could go up and see the man of the house; and all three of us walked to the house went was there, and we told him what we wanted and that I was coming to Gainesville to my father's people, and he sent this boy and he got a pint of whisky and come back, and the boy gave us the whisky, and him and this fellow Jenkins got in the wagon, and I did not see them any more that day. We sat around and talked and drank that pint of whisky, me and Kalb, and started to leave, and Mr. McConnell says there is no use to leave so early it was cold, and pulled out another bottle of liquor from the fireplace, and all three of us drank *Page 525 
a half pint and kept talking and drinking, and I reckon must have drank a pint all three together; and I asked him about parking the car to work on it to see if I could get the fan belt fixed, and he says it was all right, and I went and got the car and pulled down in there and tried to fix the fan belt, and these surveyors came up and hooked a chain to the back of the car and pulled it back on the hill in his yard where we could push it off. Right after they left we did not have anything to smoke; we had a pack of Bull Durham but we had smoked it up, and I told them I would go to the store and get some, and I went to the filling-station and bought some oil and gas and smoking tobacco and went back to Mr. McConnell's. When I got back Mr. McConnell and Kalb were playing dice, a nickel and a dime a shot, and I got in the game with them, and Kalb got broke, and I won what money Mr. McConnell had, around two dollars, and we sat down by the fire and had a little drink, and then he said he would play for a quart of whisky against a dollar back, and I eventually won the quart of whisky, and he said something about this old pistol and said he would play it against two dollars if we wanted to play, and I say to Kalb, `I don't need this thing,' and he says, `No we will give him a chance to get his money back,' and me and him got to shooting and shot an hour and a half — shortly after I won the pistol. I reckon it made him mad, and he jumped up and says, `You boys get away from here.' `All right,' I told him, `All right.' Mr. McConnell had the shotgun; he jerked it out of the corner. I reckon it was that one; it wasn't broken like that; the last time I saw it it had the stock on it. Just as Kalb came out of the door he hit Kalb on the left side of the head, and I whirled around. I did not know what he was going to do, and grabbed at the barrel of the gun, and he struck at me before I could get hold of the gun, and I hit him across the head. When I hit him I did not have any intention whatever about hurting the man. I hit him to keep him from doing any more harm to us than we could help: and that is all I know about it. This fellow Jenkins said he pulled us off. I don't remember seeing him any more that day after he left out of the house that morning."
Supplementary statement of the defendant: "I forgot to bring out something about the sheriff made a statement awhile ago, talking about me making a statement to him. If I told Sheriff *Page 526 
Bell anything concerning the case, I don't remember it, because I knew he was sheriff of Hall County and also was working under Mr. McConnell, county commissioner, and I did not figure it would do me any good to make a statement to him or either of the officials, although I talked about the first night I come in before him, and Mr. Kelley and a few men carried us in a little old room and did try to get us to make statements. I did answer a couple of questions for Mr. Kelley, but it was not concerning anything about the facts that happened in the case."
Sheriff Bell, recalled, testified as follows: "I heard the statement of the defendant, that he never did make any statement to me. He certainly did make a statement in my presence. I never heard anything about any crap shooting or rolling dice or anything until this morning. Emmett and Kalb both told me if Guy McConnell drank any liquor with either one they did not know it. That was yesterday evening. Kalb said he took a drink. But back he told us — Kalb on several occasions and Emmett on two or three occasions, and I explained to Emmett that I was an officer; and in making this statement he was not offered anything, and I told as near as I possibly could what he said. My son was present when he made a statement in the presence of Kalb. I for A. W. Jr., and A. W. Jr. was present when he made this full conversation about how it was. He made it very plain to me that when he demanded of him (McConnell) that he wanted his money, he (McConnell) handed it to him, and I asked him what it was in, and he said it was in a small sugar sack. At that time he never said anything about winning it in a crap game. I never heard of the crap game until to-day."
The court: "You mean you never heard of the crap game until you heard the statement of Mr. Emmett?" A. "I heard rumors around — all the boys at the jail — that there might be some crap game came into it. Emmett and Kalb both always made the statement that Guy did not make any effort to hurt either one of them, and Emmett made the statement he whacked him, Guy McConnell — whacked him over the head with the butt of the pistol. When I was talking to Emmett, he did not just answer questions. He made a statement. He sent for us and wanted to make a statement, and he told us freely. Of course, some things about it, *Page 527 
I might have asked a question, but he just talked and told me what happened. . . The defendant made a statement to me about a knot on his head — about how it came to be there. He said one of the boys struck him with a blackjack when he was arrested."
In grounds 1, 4, and 5 of the amendment to the motion for new trial, the movant complained of the admission of testimony of R. G. (Glenn) McConnell, R. G. McConnell Jr., and Sheriff A. W. Bell, as to statements made by the deceased and offered by the State as dying declarations. Each of these witnesses testified regarding a statement made by the deceased at the hospital on the night of January 29, a few hours after he was injured; and R. G. McConnell Jr. testified regarding a second statement made to him alone on the following night. The evidence as to each statement was objected to on the grounds, that it did not appear that the deceased was in the article of death and conscious of his condition; that the statement was too remote from the event of death, and the deceased did not give the defendant's full name, Thomas Emmett, or otherwise sufficiently identify him. In each of these grounds the evidence is set forth in question and answer form, but it will be quoted here from the narrative form as it appears in the brief of evidence.
R. G. McConnell testified as follows, regarding the statement that he heard: "As to the statement he made to me and the sheriff when me and the sheriff and my boy were there; of course we had been asking all night who killed him and who hit him, and at this time he said that Emmett did it, and he repeated that to the sheriff when we called him down there. He said, `They did it.' He called the name of one of them. With reference to the other fellow, I don't think he called his name. He just said Emmett and the other fellow. I don't think he called his name. He just said Emmett and the other fellow, or something like that. He didn't say that night what they hit him with, I don't believe. He didn't say that night where it happened. Guy lived in Hall County." As to the condition of the deceased and the circumstances under which the statement was made, the witness testified as follows: "I saw my brother, Guy McConnell, on or about January 29, that night. He was at Downey Hospital. When I saw him he was beat up, his head was beaten into a pulp, almost; gashes in his head; his eyes were, I believe, one of them was out *Page 528 
of the socket, both were in bad condition. They were closed so far as the lids were concerned. They were closed and swollen and discolored. His lips and mouth were the same way, swollen. His face was discolored and swollen the same way. When I first saw him he was unconscious. He regained consciousness during the night. My son, Glenn Jr., and myself were present. No one else was present right at that time. Of course, we called the sheriff. Sheriff Bell came in while he was conscious. Guy realized the condition he was in. I know he did. The sheriff asked him if he realized his condition, that he was in bad condition; and he said that he did. He died, I believe it was May 14th. I think they have the date at the county hospital. After the sheriff asked him if he realized his condition, he made a statement. He did not remain conscious very long at the time he made that statement. He was conscious again, I believe, the next day, probably through Saturday at different times. . . He regained consciousness, I believe, on Friday and then Saturday a time or two. As to what time of day it was when he regained consciousness the next day, my son was with him at that time. I was not with him. After that time he was never conscious from then until his death. After Sunday he was never conscious. Of course he would know people when they came in, but his mind was back thirty or forty years ago; he was not at himself. He was never himself after the time on Sunday. He continued in that condition, not being at himself mentally, from that time on Sunday until his death."
The court: "You asked the witness [deceased?] if he realized his condition. What did you mean by that, Mr. McConnell, what did he say about his condition?" A. "Well, when we asked him about that, he kind of jumped and looked like he was surprised or something, frightened." The court: "What, if anything, did he say about his condition, about whether he was going to get well or die?" A. "Well, he did not say, but he seemed to realize at the time — you could tell from the way he acted, and then he did say he realized his condition. The sheriff asked him if he realized his condition, that he was in bad shape; and he said `yes.' That was Thursday night about twelve-thirty."
It was after the introduction of this evidence as to condition of deceased and other circumstances that the court admitted the evidence first above quoted, as to declarations of the deceased. Subsequently, *Page 529 
on cross-examination, the witness testified as follows: "I never had any hopes for him from the time I first saw him. During the entire time from the day he was beaten up to May 14. I never did think he would live. I did not have any hopes for him during any of that time. I did not stay with him during the whole time. I don't know whether during some of those times he might have raised up and regained consciousness. . . He stayed at the Downey Hospital from the time he was first brought there, Thursday night or Friday, and we carried him away from there Saturday morning sometime. We carried him to the Hall County Hospital. He stayed there between ninety and a hundred days. I believe it was ninety-six days. Yes, he was able to be taken out and go to ride with me. I carried him to ride one Sunday. As to how long that was before he died, well, I imagine that was probably about half of the time before he died; something like that. He seemed to be better at that time than he was at any other time. He was very well. Of course we had to help him up and dress him and put him in the car, and then we had to undress and help him in the hospital when we got back. I never at any time had any hope for him from the first night. I did not think he would live when I took him to ride that Sunday. That was the only time I took him riding. He did not go to ride with anybody else during that period."
The court: "Was he rational or irrational that Sunday?" A. "He was irrational."
R. G. McConnell Jr. described the deceased's wounds, and further testified: "It was in the early afternoon that I first saw him. It was about eight o'clock that night when I returned to the hospital to see him. I remained there at the hospital. He remained in an unconscious condition until about — it was about twelve o'clock that night; and I kept talking to him from about eight off and on until about twelve, trying to get him to come to. He was unconscious, other than just moaning, until about twelve o'clock. There was somebody else in the room when he regained consciousness. When he first spoke, my father was there, and the nurse was in the room. Then the nurse left the room, and I suggested to call the sheriff to take in the statement. He began talking some, and we realized he was coming to. The sheriff came. He regained consciousness while me and my father and Sheriff Bell *Page 530 
were there. While we were in the room he came to and seemed to be very rational. He talked to us three of four minutes or may be five or six minutes. We were all talking to him, and the sheriff walked over to him and said, `Guy, you realize you are in bad shape,' and it seemed to startle Uncle Guy, and he jumped up; he said, `Yes, I am going to die; they hurt me bad.' He was trembling then. He seemed to realize he was going out. He remained conscious during that time for a period of five or six minutes, I suppose; he talked rationally. As to what statement he made during that time, we asked him how it happened, who hit you or what happened, and he said, `They hit me and took my money.' He seemed to be very upset about taking the money. `They hit me and took my money.' We said, `How did it happen?' and he said, `They wanted to see my gun, and I went to get it out of the little cupboard and handed it to him,' and he did like `they hit me' and then we asked him who hit him. That was the first statement he made. The first statement he said, `They hit me,' and we asked him who hit him and asked him did he know Emmett and Kalb — he seemed to know Emmett and called Kalb the other man — he said `Emmett hit me.' He said, `The other fellow helped tie me up.' He lapsed into unconsciousness then, and that night so far as I know he did not come to again. I was there the next night, and he came back to and talked to me again. As to how came him to talk to me again, well, I kept trying to talk to him all the time I was with him. I was trying to get every bit of information I could, and he did not ever seem to catch what I was saying, except the first night and the second night and the early part of the night I was with him by myself. The nurses had been trying to get him to take some nourishment or something, and he came to, and I was talking to him, and he gave me the same statement. I got it definitely then — he said, `They wanted to see my gun,' and said, `We were all sitting together in front of the fire, and they wanted to see my gun.' He said, `They killed me.' That was the statement he made about them. He must have known he was dying; he was in extreme pain. I said, `Well, then, Guy, just explain how did it happen. How did you get hurt like this? Who hit you?' And he said `Emmett.' He called him Emmett, and this other and he did not seem to know him. He said, `They wanted to see my gun. I took them into *Page 531 
the bedroom' (which was an adjoining room to the one they were in) `and went in to the cupboard.' And I said, `You gave it to them.' And he said, `Yes, and when I gave it to them they hit me.' I said, `Who hit you?' He said, `Emmett.' I says, `Where was Kalb, where was the other fellow?' I said, `Did he hit you?' And he said, `No, he tied me up.' Then I kept asking questions and assuring myself what he did say was `Emmett hit me,' and he lapsed into unconsciousness, and as far as I know he never regained consciousness again. . . When I was asking him these questions, I didn't just ask him, `Did Emmett or Kalb do it?' I knew that would be wrong. I asked him, `Who hit you?' and he made the definite statement. I made no suggestions whatever. I mentioned no names. Nobody else did while I was in the room. I was there the first two nights and two days. He was unconscious except those two periods, and I was in the room all the time. I left there for small periods of time for meals, and I did not sleep any except small periods. I don't know whether anybody else mentioned names after the second statement that he made me; but the first statement I know there was no mention of names, because I was there with him from the time I came back to the hospital until the next morning, and that was after his first statement had been made."
A. W. Bell testified: "I am the sheriff of Hall County. Around midnight, a little after midnight on the night of [January 29], I saw Guy McConnell. . . They called me a little after midnight. . . When I got there Guy McConnell spoke to me and I spoke to him, and he knew me, and in the course of our conversation he appeared to be rational for some few minutes. He knew who I was. He called me by name. He could detect me by my voice. His eyes and mouth were swollen. One eye was swollen much more than the other, all discolored and all where you could not have recognized him if you had not known him. After he called me by name and recognized my voice, I asked him then did he realize his condition, and he said he did. The words as I remember he said, `I am killed,' or `nearly killed.'"
The court: "Said what?" A. "That he was killed. He says, `I am killed,' or something to that effect — nearly dead or nearly killed — I would not say which. At any rate he was in his room then on the hospital bed. As to what statement he then made, the *Page 532 
first thing he said, `They knocked me.' I says, `Guy, who knocked you?' I says, `Did you know the man?' I asked him did he know the men that he had previously referred to as `they,' he called Emmett's name and referred to Kalb as the other man. He never did call Kalb's name. He said they asked him about his pistol, and it was in a cupboard of a place, and he went and got it and handed it to Emmett, and he said he struck him with it. And I asked him, as I remember, `What about your money, Guy?' and he said, `They told me to give it to them, and I handed it to them, and they struck me again,' and that is about the end, `he struck me again,' I believe that is the word he said. He said, `They tied me up,' and I said, `Who tied you?' and he said, `The other man tied me.' The shotgun was not mentioned. That is the way I remember it. I tried to take it in, and have tried to remember it all the while just what was said. . . I saw Guy McConnell a number of times after that night. I talked with him some more. As to whether he regained consciousness any more after that night I talked to him, he would speak to you and then drop back to things years and years ago and talk about folks dead as though they were there. He would know you. I remember one time he did inquire about Charlie Holland. Charlie has been dead for year. He did recognize me after the first night I talked to him."
Other grounds of the motion for a new trial are stated in the opinion, infra.
1. The grounds of the motion for a new trial as designated by numericals in this opinion will refer to the grounds as they appear in the amendment of the motion, but they will be considered in a somewhat different order.
In grounds 1, 4, and 5 the movant complained of the admission of testimony of R. G. (Glenn) McConnell, R. G. McConnell Jr., and Sheriff A. W. Bell, as to statements made by the deceased and offered by the State as dying declarations. All of these witnesses testified regarding a statement made by the deceased at the hospital on the night of January 29, a few hours after he was injured *Page 533 
and R. G. McConnell Jr. testified regarding a second statement, made to him alone on the following night. The evidence as to each statement was objected to on the grounds, that it did not appear that the deceased was in the article of death and conscious of his condition, that the statement was too remote from the event of death, and that the deceased did not give the defendant's full name, Thomas Emmett, or otherwise sufficiently identify him. The testimony regarding these declarations has been set forth in the preceding statement in connection with these grounds, and will not be repeated here. This evidence, considered with the testimony of the physicians, was sufficient to show prima facie that the declarations of the deceased were made while he was in the article of death and conscious of his condition, and the declarations were admissible in evidence as against the objections urged. "Declarations by any person in the article of death, who is conscious of his condition, as to the cause of his death and the person who killed him, shall be admissible in evidence in a prosecution for the homicide." Code, § 38-307. The declarations were not objectionable because the full name of the defendant was not stated, there being other evidence to show that the name "Emmett" as used by the deceased referred to the accused. Nor was it necessary that the testimony of each witness should disclose that the deceased was in a dying condition and conscious thereof, in order for such testimony to be admissible, but it was permissible to lay the foundation by other witnesses.Simpson v. State, 168 Ga. 598 (2) (148 S.E. 511); Gibbs
v. State, 190 Ga. 207 (4) (9 S.E.2d 248). Moreover, that the declarant was in the article of death and conscious of his condition could be shown by the nature of the wound and other circumstances, and need not appear from the declaration itself.Simmons v. State, 181 Ga. 761 (2) (184 S.E. 291); Rouse
v. State, 183 Ga. 551 (188 S.E. 904). Nor was either statement on its face so fragmentary or incomplete as to require its rejection. Park v. State, 126 Ga. 575 (2) (55 S.E. 489); 26 Am. Jur. 435, § 400; 30 C. J. 277, §§ 515, 516; Worthington v. State, 92 Md. 222 (48 A. 355, 56 L.R.A. 352, note 428); Daughters v. Kentucky, 255 Ky. 172 (73 S.W.2d 10, 94 A.L.R. 673, note 679).
Where the foundation for such a declaration has been prime facie established, the evidence is properly admitted, and the ultimate determination as to whether the person making it was in articulo *Page 534 
mortis and realized that death was impending is a matter for the jury. Findley v. State, 125 Ga. 579 (54 S.E. 106).
Should the declarations here have been excluded, as being too remote from the event of death, which did not occur until about three and a half months later? If a declaration is made while the declarant is in extremis as result of an injury, and while he is under a sense of impending death, without hope of recovery, and his death follows as a result of such injury, the fact that death does not immediately follow the declaration will not render evidence of it inadmissible as a matter of law; although if the interval is long, this fact may be some evidence that the declarant had not despaired of recovery. Parks v. State,105 Ga. 242 (31 S.E. 580); Davis v. State, 120 Ga. 843 (3) (48 S.E. 305); Mattox v. U.S., 146 U.S. 140, 151
(13 Sup. Ct. 50, 36 L. ed. 917); 26 Am. Jur. 439, § 408. Despair may exist and be sufficiently proved, although life may have continued longer than was expected. Shepard v. United States, 290 U.S. 96
(54 Sup. Ct. 22, 78 L. ed. 196); State v. Byrd, 41 Mont. 585
(111 P. 407, 414); 13 Words Phrases, 749. "The actual period of survival after making the declaration is not controlling. The question does not depend upon the length of time between the declaration and the death of the declarant, but upon the declarant's mind at the time of the declaration, and his belief that he is in a dying condition." Johnson v. State, 169 Ga. 814
(3b) (152 S.E. 76). In that case it appeared that the declarant lived about two months after making the declaration. InMiles v. State, 182 Ga. 75 (185 S.E. 286), the period was thirty-three or thirty-four days. Compare Harper v. State,129 Ga. 770 (3), 774 (59 S.E. 792), where it was said that "The test is not so much the contiguity between the making of the statement and the death of the declarant, as whether they were made in articulo mortis, and when he was conscious of his condition." In State v. Craine, 120 N.C. 601 (27 S.E. 72), it was held that a lapse of five months before death would not render the declaration inadmissible.
The present case is distinguished by its facts from Howard
v. State, 144 Ga. 169 (86 S.E. 540), where, in reply to a question as to whether he was going to die, the declarant said he was, "if they did not do something for him," and made other statements of similar import. We also consider the instant case as being materially *Page 535 
different from Mitchell v. State, 71 Ga. 128 (2), which has been cited and relied on as practically controlling. In that case, the injury from which the declarant was suffering was such as to deprive him of consciousness that he was even wounded, and it required much effort to convince him of this fact. Other circumstances were mentioned, and the decision was finally predicated upon a combination of circumstances, such as we do not find in the instant case. See 71 Ga. 148. The decision inDarby v. State, 9 Ga. App. 700 (3) (72 S.E. 182), is not binding as a precedent upon this court. Furthermore, only two of the three members of the court concurred in that decision. The other cases cited by counsel for the plaintiff in error on admissibility of evidence as to "dying declarations" do not, in our opinion, bear such similarity to the case at bar as to require special mention in this connection.
The foregoing deals sufficiently with the objections that were made, although the argument of counsel has taken a somewhat wider range. Henslee v. Harper, 148 Ga. 621 (97 S.E. 667). There is no merit in grounds 1, 4, and 5.
2. In ground 2 the defendant complained of the following charge: "It is contended by the State that certain statements were made by Mr. Kalb, a joint defendant, in the presence of the accused, Mr. Emmett, that is the defendant on trial, and it is the contention of the State that those statements were made by Mr. Kalb under such circumstances as would require Mr. Emmett to deny the statements as made. Now the court doesn't say any statements were made; the court doesn't say that any denial was not forthcoming, but that is one of the contentions of the State, and you must determine this case not from the contentions but by the evidence and the statement made by the accused. But I charge you in that connection, gentlemen, this principle of law: It is insisted by the State in this case that certain statements were made in the presence and hearing of the defendant, Mr. Emmett, as to who committed the offense and how it was committed, and that he failed to make any answer or any denial under conditions that required an answer or denial by him. Now on that I charge you that acquiescence or silence, when the circumstances require an answer or a denial or other conduct, may amount to an admission by the defendant. It is for you to say whether or not these statements or such statements were made in the presence and hearing *Page 536 
of the defendant, Mr. Emmett, and whether or not the circumstances were such as to require an answer or a denial by him; and if you find that they were made in his presence and in his hearing, and that the circumstances were such that an answer or a denial was required, and that he made none, then you would be authorized to treat such statements as admissions by him."
The movant quoted in this ground certain testimony of the sheriff which he insisted was the only evidence that could be claimed as basis for such instruction, and then assigned the charge as error upon the ground that it appeared without conflict that at the time of the "incident" to which the sheriff referred the movant was in jail, charged with the offense of assault upon the person of Guy McConnell, who had not then died, and was in the presence of the sheriff and solicitor-general, who had endeavored to elicit information in reference to such assault. The movant contended that in these circumstances he had the right to remain silent without his silence being construed as an implied admission, and that the foregoing instruction had the effect of compelling him to be a witness against himself "simply by remaining silent," contrary to the fifth amendment of the constitution of the United States and the similar provision of the State constitution, and deprived him of life and liberty without due process of law, contrary to the fourteenth amendment. It was further insisted that since the testimony of the sheriff related only to statements of Kalb, a co-conspirator, after the transaction had ended, such statement itself would not have been admissible as against Emmett, and it was therefore erroneous for the court to instruct the jury in such way as to permit them to base a verdict upon an alleged admission by silence as to a statement alleged to have been made by an alleged co-conspirator after the transaction had completely ended.
It is declared by the Code that "Acquiescence or silence, when the circumstances require an answer or denial or other conduct, may amount to an admission." Code, § 38-409. The authorities are in conflict on whether failure of an accused to deny a statement made in his presence, tending to incriminate him, may be introduced in evidence as an admission, where he was under arrest or in custody under a criminal charge at the time the statement was made. According to some decisions, the mere, fact that the accused was under arrest or in custody would not be sufficient to *Page 537 
render the testimony inadmissible, and may be considered only as a circumstance in determining whether the silence of the accused might be taken as an admission. According to other decisions, the evidence would not be admissible at all under such circumstances. 20 Am. Jur. 486, § 574; 26 Am. Jur. 417, § 376.
Counsel for the plaintiff in error rely on Johnson v.State, 151 Ga. 21 (105 S.E. 603), for the proposition that such evidence would be without probative value and inadmissible. While the question was discussed at some length in that case, and the decision contained several broad statements tending to support the contention here urged, the final ruling was that "under such circumstances an implication that silence on the part of the accused amounts to positive evidence of guilt is unwarranted," and that the evidence as a whole was insufficient to support the verdict of guilty. Only three Justices concurred in the opinion as written, one merely concurring in the judgment and two dissenting on the ground that the evidence was sufficient to support the verdict. In McCormick v. State, 176 Ga. 21
(1) (166 S.E. 762), similar evidence was admitted over the objection, among others, that at the time of the statement the defendant was confined in the common jail, and was in the presence of the prosecuting attorney and deputy sheriff, with "nobody present to look after his interests.' It was held by this court that the judge "did not err in admitting this evidence over the objections presented, none of which show any legal reason why the evidence was inadmissible." In our opinion, the mere fact that the accused is under arrest or in custody would not render such evidence inadmissible, or make it improper to instruct the jury in reference thereto, although in so doing the judge should be careful to inform the jury that they are to determine whether under all the circumstances an answer or denial was required.Hammond v. State, 156 Ga. 880 (120 S.E. 539). The charge complained of in ground 2 conformed to this view, and was not erroneous as contended. Compare Cobb v. State, 27 Ga. 648
(4), 698; Franklin v. State, 69 Ga. 36 (2, 3); Smiley v.State, 156 Ga. 60 (118 S.E. 713); Simmons v. State,181 Ga. 761 (5) (184 S.E. 291); Elliott v. State, 190 Ga. 803
(5) (10 S.E.2d 843). This ruling will also control ground 3, complaining of the admission of testimony. The evidence was not inadmissible for any reason stated in the objection. *Page 538 
3. In ground 3 the defendant assigned error upon the ruling of the judge admitting the following testimony of A. W. Bell, sheriff of Hall County: "In my conversation with Thomas Emmett when he made these statements to me that I have already testified about, he said he got the automobile they came up there in, in Atlanta. He did not say exactly what street he got it on, but he said he got it in Atlanta. He said he stole it. The automobile was carried to Forsyth County and from there delivered back to the owner."
This evidence was objected to on the grounds that it was irrelevant and prejudicial, and tended to place the defendant's character in issue. The court overruled the objection, and instructed the jury to consider the evidence only as it might illustrate motive, intent, or conduct.
If the testimony had related merely to the theft of an
automobile, its admissibility might be doubtful; but since it concerned the particular automobile that the defendant had in his possession at the time of the homicide, we have no hesitancy in holding that it was admissible for the purpose stated by the judge. If the defendant did in fact steal the particular automobile as stated, the offense was repeated in Hall County, and even on McConnell's premises, on the very day and occasion of the homicide. To this extent, at least, the offense was a continuing one, and evidence of it would tend to illustrate the defendant's state of mind at the time, and to show a motive for the killing. Code, § 26-2602; Farmer v. State, 100 Ga. 41
(2) (28 S.E. 26); McCoy v. State, 123 Ga. 143
(51 S.E. 279); Lanier v. State, 25 Ga. App. 489 (2) (103 S.E. 730). An intent to steal is an element of the offense of robbery; and there was other evidence to support the theory that McConnell received the wounds from which he died during the commission of a robbery upon him, and that such robbery was the motive. As to elements of robbery, see Moyers v. State, 186 Ga. 446, 448
(197 S.E. 846).
The general rule is that the character of the parties, and especially their conduct in other transactions, are irrelevant matter, unless the nature of the action involves such character and renders necessary or proper the investigation of such conduct. Code, § 38-202; Cawthon v. State, 119 Ga. 395 (4) (46 S.E. 897); Lanier v. State, 187 Ga. 534 (3) (1 S.E.2d 405). While, under this *Page 539 
general rule, evidence as to commission of a crime separate and distinct from the alleged offense for which the defendant is on trial is generally irrelevant, the rule is subject to well-established exceptions, one of which is that evidence of another offense may be submitted for the purpose of showing motive, plan, or scheme. Wilson v. State, 173 Ga. 275 (2) (160 S.E. 319); Cooper v. State, 182 Ga. 42 (3) (184 S.E. 716).
It appears in this case that McConnell was mortally wounded in his own home, and apparently by strangers. There were no eye-witnesses, and inquiry would naturally lead to a consideration of the circumstances. Was the killing murder, or were there circumstances of mitigation or justification? While proof of a particular motive is not essential to establish the crime of murder, it is always relevant and admissible as a circumstance. Hunter v. State, 188 Ga. 215, 217 (2) (3 S.E.2d 729).
The evidence to which objection was made tended to show a present state of mind inclined to theft or larceny; and since it thus corroborated the other evidence on the issue as to motive, the objections urged were not well taken. Hill v. State,161 Ga. 188 (2) (129 S.E. 647); Green v. State, 172 Ga. 635
(3) (158 S.E. 285); Suber v. State, 176 Ga. 525
(168 S.E. 585); Black v. State, 187 Ga. 136, 137 (3) (199 S.E. 810).
4. The judge charged the jury as follows, in reference to the defendant's statement: "The defendant, Thomas Emmett, has made to the court and jury, as he had a right to do, a statement. His statement, under the law of this State, is not made under oath; he is not subject to cross-examination except by his own consent; yet you as a jury have a right to believe his statement in whole, believe it in part, and to believe it in preference to any or all of the sworn testimony if you see proper to do so. In other words, gentlemen, you as the jury have a right to believe the unsworn statement of the defendant in preference to any of the sworn testimony in this case, if you see proper to give it that weight and that place and that importance in the trial of this case."
In ground 11, the defendant assigned error upon the last sentence of the foregoing excerpt, on the grounds: (a) It was not sound as a matter of law, and was an incorrect statement of the law; (b) the jury had the right to believe the statement of movant in preference to the sworn testimony, and it was their duty to accept *Page 540 
it if in their opinion it was the truth, and the criterion by which the jury were bound to accept or reject it was whether in their opinion it was true, and therefore, it was erroneous to submit an issue to them as to whether the statement was important or unimportant; (c) the expression, "if you see proper to give it that weight and that place and that importance in the trial of this case," amounted to an intimation and an expression of an opinion by the court that the statement of movant was of little importance and entitled to no consideration, but that the jury had the power to believe it if they wanted to do such a violent thing; (d) the court should have instructed the jury that they could believe the statement in preference to the sworn testimony if they thought it was the truth, without using the language, "if you see proper to give it that weight and that place and that importance in the trial of this case."
The movant states the correct criterion by which the jury should appraise a defendant's statement; and it is true also that the defendant in a criminal case is entitled as a matter of law to have his statement considered and weighed by the jury without any disparagement by the court. The jury may believe the statement in preference to the sworn testimony, if they find that it is true, and there is no other standard.
The judge elsewhere instructed the jury that the object of all legal investigations is discovery of the truth, and charged them as to reasonable doubt, whether arising from the evidence or the defendant's statement, and as to their duty, in case of conflict, "to believe that witness or those witnesses or the defendant's statement, whichever in your opinion is most worthy of belief," this being "a matter entirely for the jury to determine." When the excerpt complained of is considered with the entire charge, it clearly made truth the criterion, and the only criterion, as to whether the jury might believe the defendant's statement in preference to the sworn testimony. While the last sentence may have been superfluous, it did not withdraw or qualify the other instructions, but left the jury free to accept or reject the statement according to their opinion as to its truth, and was not erroneous as contended. See, in this connection, Hendricks v.State, 73 Ga. 577; Walker v. State, 120 Ga. 491
(48 S.E. 184); Field v. State, 126 Ga. 571 (4) (55 S.E. 502);Delk v. State, 135 Ga. 312 (2) *Page 541 
(69 S.E. 541, Ann. Cas. 1912A, 105); Sims v. State,177 Ga. 266 (4) (170 S.E. 58); Smith v. State, 179 Ga. 791,794 (177 S.E. 711); Douberly v. State, 184 Ga. 573 (4), 575 (192 S.E. 223). We take occasion to say once more, however, that it would always be safer to follow the clear and explicit language of the Code, rather than to risk the possibility of some unguarded and inapt expression which might be misunderstood by the jury. Code, § 38-415.
5. In ground 12 the movant assigned error on the following charge: "If you find from the evidence beyond a reasonable doubt that these defendants, or this defendant together with another party not on trial, were committing robbery on Mr. Guy McConnell, which is a felony under the law of this State, and if in the commission of such robbery, or in their effort to commit the robbery, a mortal blow was inflicted upon Mr. McConnell and he died from that, then I charge you, gentlemen of the jury, that that would be murder under the laws of this State."
This charge was criticised upon the ground that it was based upon stated evidence of the sheriff as to confession of a robbery by movant and his codefendant, and was erroneous and prejudicial, because there was no corroboration of the alleged confession, and no evidence authorizing submission of such an issue to the jury. There is no merit in this exception. See Gore v. State,162 Ga. 267 (134 S.E. 36); Simpson v. State, 168 Ga. 598
(148 S.E. 511); Simmons v. State, 181 Ga. 761
(184 S.E. 291); Jenkins v. State, 190 Ga. 556 (9 S.E.2d 909).
6. In ground 10 the movant complained of the refusal of the judge to charge the following, as requested: "If from the evidence or from the defendant's statement you should believe that the defendant did not in fact intend to kill the said Guy McConnell, then you would not be authorized to convict for the offense or murder." The court did not err in refusing to charge as thus requested. To have done so would have ignored the principle that if an involuntary killing should happen in the commission of an unlawful act which in its consequences naturally tends to destroy the life of a human being, the offense shall be adjudged to be murder; and would also have read out of the case the evidence which tended to show that McConnell was killed in the commission of a robbery upon his person. Code, § 26-1009. There is *Page 542 
no merit in this ground. This ruling will apply also to grounds 8 and 9, complaining in like manner of refusal to give requested charges.
7. In ground 6 the defendant complained that the judged erred in charging the jury on the subject of drunkenness, when the jury after deliberating for some time informed the court that further instruction was desired. The motion contained the following statement as to what occurred at this time: The court: "Mr. Foreman and gentlemen of the jury, you say you want to be reinstructed — want some further instruction?" Foreman: "Yes, sir." The court: "What is the point you want instruction about?" Foreman: "We would like to know if the condition of the deceased or of the defendants or their reputation, whether they were drunk or sober would have any bearing on our verdict?" The court. "All right. Gentlemen, I charge you that if you find from the evidence that the defendant, Mr. Emmett, was intoxicated and that intoxication was produced by his own voluntary act, that it would be no justification to him if during his intoxicated condition which was a voluntary act on his part — that would be no defense if he unlawfully while in that condition took the life of the deceased. I charge you that if the deceased himself was intoxicated, that is, if Mr. McConnell was intoxicated, or, if he was drinking, that that of itself would give the defendant no right unlawfully to take his life. Now does that cover the point you had in mind?" Foreman: "I think it does." The court: "All right, you may retire."
This was the only charge that was given in response to request for further instruction. The jury retired to their room, and in about five minutes returned the verdict finding the defendant guilty, without a recommendation. It was contended that the jury could have found from the evidence that the defendant was intoxicated at the time of the killing, and that all of the persons involved had been drinking intoxicating liquors; and it was insisted that in these circumstances the recharge was erroneous and prejudicial, for the following reasons: (a) It was not sound as a proposition of law; (b) it did not embrace the principle that drunkenness like any other fact might be considered by the jury to illustrate the question of intent and motive in the commission of an act and to shed light upon the transaction, and therefore it was not a complete statement of law on the question involved. The *Page 543 
court, having undertaken to instruct the jury on the question of what effect drunkenness might have had on the transaction, was in duty bound to give a complete statement of the law pertinent to that issue, and the failure so to do was error harmful and prejudicial to movant; (c) it did not fully present both aspects of the case, and gave only part of the information requested by the jury; (d) it failed to call the attention of the jury to the view of the facts consistent with innocence, and only called attention to that view suggesting guilt; (e) nowhere in this charge was the jury instructed that drunkenness could be considered as a circumstance in determining the intent of the defendant to murder the deceased; and (f) nowhere in the charge was the jury instructed as to the reputation of either the deceased or the defendant as to drunkenness or soberness, as requested by the jury.
It is declared in the Code that drunkenness shall not be an excuse for any crime or misdemeanor, unless it was occasioned by the fraud, artifice, or contrivance of another person for the purpose of having a crime perpetrated. Code, § 26-403. Whether or not under the facts of the instant case it would have been proper to instruct the jury further that drunkenness may be considered on the question of intent and motive, and to shed light upon the transaction, the mere failure to add such further instruction without request of the defendant was not erroneous. Nor is there merit in the other exceptions to the charge as given in reply to the jury's request. See, in this connection, Jenkins v.State, 93 Ga. 1 (2) (18 S.E. 992); Dickens v. State,137 Ga. 523 (5) (73 S.E. 826); Hicks v. State, 146 Ga. 221
(5) (91 S.E. 57); Cone v. State, 193 Ga. 420 (4), 432 (18 S.E.2d 850). Nothing to the contrary was ruled in Gravett v.State, 74 Ga. 191 (2).
8. In grounds 7 and 14 the movant complained of a ruling admitting in evidence certain articles of personalty, to the introduction of which the defendant objected on the ground that they had not been sufficiently identified, and on other grounds. There was no merit in any of the objections urged, and the court did not err in admitting the evidence.
9. The evidence authorized the verdict, and the court did not err in refusing a new trial.
Judgment affirmed. All the Justices concur. *Page 544